WRITERS GUILD OF AMERICA, WEST, INC., et al., Plaintiffs-Appellees,

v.

AMERICAN BROADCASTING CO., INC., Defendant-Appellant.

WRITERS GUILD OF AMERICA, WEST, INC., et al., Plaintiffs-Appellees,

v.

NATIONAL ASSOCIATION OF BROADCASTERS, Defendant-Appellant.

WRITERS GUILD OF AMERICA, WEST, INC., et al., Plaintiffs-Appellees,

v.

CBS, INC., Defendant-Appellant.

WRITERS GUILD OF AMERICA, WEST, INC., et al., Plaintiffs-Appellees,

v.

NATIONAL BROADCASTING CO., INC., Defendant-Appellant.

TANDEM PRODUCTIONS, INC., a corporation, Plaintiff-Appellee,

v.

NATIONAL BROADCASTING CO., INC., a corporation, Defendant-Appellant.

TANDEM PRODUCTIONS, INC., a corporation, Plaintiff-Appellee,

v.

COLUMBIA BROADCASTING SYSTEM, INC., a corporation; American Broadcasting Companies, Inc., a corporation; National Association of Broadcasters, a corporation, Defendants-Appellants.

---

TANDEM PRODUCTIONS, INC., a corporation, Plaintiff-Appellee,

v.

COLUMBIA BROADCASTING SYSTEM, INC., a corporation; National Broadcasting Co., Inc., a corporation; American Broadcasting Companies, Inc., a corporation; National Association of Broadcasters; Robert E. Lee; James H. Quello; Charlotte T. Reid; Glen O. Robinson, Defendants,

and

Federal Communications Commission; Richard E. Wiley; Benjamin C. Hooks; Abbott Washburn, Defendants-Appellants.

WRITERS GUILD OF AMERICA, WEST, INC., et al., Plaintiffs-Appellees,

v.

FEDERAL COMMUNICATIONS COMMISSION et al., Defendants-Appellants.

WRITERS GUILD OF AMERICA, WEST, INC., Plaintiffs-Cross-Appellants,

v.

FEDERAL COMMUNICATIONS COMMISSION et al., Defendants-Cross-Appellees.

Nos. 77–1058 to 77–1060, 77–1756, 77–1897, 77–2357, 77–1103 and 77–1602.

United States Court of Appeals, Ninth Circuit.

Nov. 14, 1979.

Rehearing Denied Jan. 30, 1980.

Mark N. Mutterperl, J. Roger Wollenberg, Washington, D. C., for defendants-appellants.

Ronald L. Olson, Seth M. Hufstedler, Los Angeles, Cal., for plaintiffs-appellees.

Appeal from the United States District Court for the Central District of California.

Before SNEED and HUG, Circuit Judges, and ENRIGHT *, District Judge.

SNEED, Circuit Judge:

Plaintiffs Writers Guild of America, West, Inc. (Writers Guild) [1] and Tandem Productions, Inc. (Tandem) instituted these consolidated actions against the Federal Communications Commission (FCC) and its Commissioners Wiley, Hooks, Lee, Quello, Reid, Robinson, and Washburn, the three major television networks (ABC, CBS, and NBC), and the National Association of Broadcasters (NAB) to challenge the adoption of the so-called "family viewing policy" as an amendment to the NAB Television Code. [2] The Writers Guild plaintiffs sought declaratory and injunctive relief against the government defendants for violations of the First Amendment, the Administrative Procedure Act, and section 326 of the Federal Communications Act, and against the private defendants on both

---

* Honorable William B. Enright, United States District Judge for the Southern District of California, sitting by designation.

1. The Writers Guild plaintiffs are various directors, actors, writers, and producers of television programs as well as the Writers Guild of America, West, Inc., Writers Guild of America, East, Inc., Directors Guild of America, Inc., and Screen Actors Guild, Inc.

2. The Family Viewing Policy reads, in its entirety, as follows:

Additionally, entertainment programming inappropriate for viewing by a general family audience should not be broadcast during the first hour of network entertainment programming in prime time and in the immediately preceding hour. In the occasional case when an entertainment program in this time period is deemed to be inappropriate for such an audience, advisories should be used to alert viewers. Advisories should also be used when programs in later prime time periods contain material that might be disturbing to significant segments of the audience.

These advisories should be presented in audio and video form at the beginning of the program and when deemed appropriate at a later point in the program. Advisories should also be used responsibly in promotional material in advance of the program. When using an advisory, the broadcaster should attempt to notify publishers of television program listings.

Special care should be taken with respect to the content and treatment of audience advisories so that they do not disserve their intended purpose by containing material that is promotional, sensational or exploitative. Promotional announcements for programs that include advisories should be scheduled on a basis consistent with the purpose of the advisory.

First Amendment and antitrust grounds.[3] Tandem sought damages in addition to declaratory and injunctive relief against the government defendants for violations of the First Amendment and section 326 of the Federal Communications Act, and against the private defendants on First Amendment and antitrust grounds. The actions were consolidated and tried before the district court.[4] The court, in a lengthy and closely reasoned published opinion, concluded that: (1) threats, influence, and pressure by the Chairman of the FCC caused the networks and the NAB to adopt the family viewing policy; (2) the FCC committed a per se violation of the First Amendment by exerting improper pressure on the networks; (3) the FCC violated the Administrative Procedure Act (APA) by implementing public policy by informal pressure instead of by complying with the Act's procedural requirements; (4) the action of the networks and the NAB constituted "government action" for purposes of the First Amendment both because adoption of the family viewing policy had been caused substantially by FCC pressure and because the networks, the NAB, and the FCC participated in an "unprecedented joint venture" in an effort to compromise the independent judgments of other broadcast licensees; and (5) the networks and the NAB violated the First Amendment by "fail[ing] to exercise independent program judgments and instead becom[ing] surrogates in the enforcement of government policy" and by agreeing to compromise the independent programming judgments of individual broadcast licensees. `Writers Guild of America, West, Inc. v. FCC, 423 F.Supp. 1064 (C.D.Cal.1976). All parties have appealed.

The district court certified its decision in the Writers Guild suit as a final order pursuant to Fed.R.Civ.P. 54(b). An interlocutory appeal in the Tandem suit was authorized by the district court pursuant to 28 U.S.C. § 1292(b). This court permitted the appeal. The Writers Guild and Tandem suits were consolidated. Our jurisdiction rests on 28 U.S.C. §§ 1291 and 1292(b).

The primary issues on appeal are: (1) Whether the district court erred in concluding that the district court was proper forum for this litigation and that neither the doctrine of exhaustion of administrative remedies nor the doctrine of primary jurisdiction required FCC consideration of plaintiffs' claims prior to district court action; (2) whether the actions of the networks and the NAB amounted to "governmental action" for purposes of the First Amendment; (3) whether the conduct of the FCC, the networks, and the NAB violated the First Amendment; (4) whether the conduct of the FCC violated the Administrative Procedure Act; (5) whether plaintiff Tandem is entitled to recover damages from the private defendants for the alleged violation of its First Amendment rights; and (6) whether the district court erred in denying plaintiffs an award for attorneys fees. Because we conclude that this case raises issues of major significance to the administration of the regulatory scheme pertaining to the broadcast media that properly rest within the primary jurisdiction of the FCC, we do not reach issues (2) through (5). Instead, we vacate the judgment of the district court with instructions to hold in abeyance · plaintiffs' claims against the private defendants pending resolution and judicial review of the administrative proceedings before the FCC.

Before proceeding to the jurisdictional issue, it will prove helpful first to summarize the conduct from which this dispute arose, and then to present in a somewhat stark form the legal propositions on which the district court based its decision.

## I. FACTUAL BACKGROUND—PROMULGATION OF THE FAMILY VIEWING POLICY

The impact of violent and sexually-oriented television programming was the sub-

---

3. Plaintiff Lear asserted no Sherman Act claim.

4. All issues except for the antitrust aspects of the cases were consolidated for trial. The par-

ties agreed to defer trial concerning the amount of damages, if any, suffered by plaintiff Tandem.

ject of intense public and congressional concern throughout the two decades preceding the adoption of the family viewing policy as an amendment to the NAB Television Code.[5] The specific events giving rise to this lawsuit, however, commenced in June 1974 when the House Appropriations Committee directed the Federal Communications Commission "to submit a report to the Committee by December 31, 1974, outlining the specific positive actions taken or planned by the Commission to protect children from excessive violence and obscenity." H.R.Rep.No.1139, 93d Cong., 2d Sess. 15 (1974). On August 1, 1974, the Senate Appropriations Committee followed suit, "urging the Commission to proceed as vigorously and as rapidly as possible—within Constitutional limitations—to determine what is its power in the area of program violence and obscenity, particularly as to their effect on children." S.Rep.No.1056, 93d Cong., 2d Sess. 19 (1974).

After soliciting suggestions from his staff concerning how best to respond to the congressional directive, the Chairman of the FCC, Richard Wiley, embarked on a course of what is described by the press as "jawboning," to have the networks adopt a system of self-regulation that would reduce the amount of sex and violence in television programming without the need for any "formal" Commission action. The FCC staff had recommended a variety of Commission responses to the problem, including issuing notices of inquiry, notices of proposed rulemaking and policy statements. Chairman Wiley, however, opted for jawboning instead, in the belief that many of the staff proposals for formal action would pose serious First Amendment and section 326 problems. 47 U.S.C. § 326.[6] A similar use of jawboning earlier had proven successful in inducing industry self-regulation in the area of children's television programming. *See Action for Children's Television v. FCC*, 183 U.S.App.D.C. 437, 564 F.2d 458 (D.C.Cir.1977) (*ACT*).

Chairman Wiley's campaign ultimately involved: (1) five meetings between himself and/or members of the Commission staff and industry representatives at which various proposals for dealing with the problem of televised sex and violence were discussed; (2) three public speeches by Chairman Wiley in which he exhorted the industry to undertake its own action but indicated that unless some action were taken, the government might well be forced to become formally involved with the problem; (3) several telephone conversations between Chairman Wiley and various network exec-

---

**5.** *See, e. g.,* Hearings on Violence on Television Before the Subcomm. on Communications of the Senate Comm. on Commerce, 93d Cong., 2d Sess. (1974); Hearings in Review of Policy Matters of Federal Communications Commission and Inquiry into Crime and Violence on Television and a Proposed Study Thereof by the Surgeon General Before the Subcomm. on Communications of the Senate Comm. on Commerce, 91st Cong., 1st Sess., ser. 91, pt. 6 (1969); Hearings for the Investigation of Juvenile Delinquency in the United States Before the Subcomm. to Investigate Juvenile Delinquency of the Senate Comm. on the Judiciary, 88th Cong., 2d Sess., pt. 16 (1964); Hearings for the Investigation of Juvenile Delinquency in the United States Before the Subcomm. to Investigate Juvenile Delinquency of the Senate Comm. on the Judiciary, 87th Cong., 1st & 2d Sess., pt. 10 (1961–62); Hearings for the Investigation of Juvenile Delinquency in the United States Before the Subcomm. to Investigate Juvenile Delinquency of the Senate Comm. on the Judiciary, 84th Cong., 1st Sess. (1955) and 83d Cong., 2d Sess. (1954). For discussions of more recent congressional and public concern

about televised violence see Subcomm. on Communications of the House Comm. on Interstate and Foreign Commerce, 95th Cong., 1st Sess., Report of Violence on Television (Comm. Print 1977); Krattenmaker & Powe, Televised Violence: First Amendment Principles and Social Science Theory, 64 Va.L.Rev. 1123, 1130–32 (1978); Albert, Constitutional Regulation of Televised Violence, 64 Va.L.Rev. 1299, 1310–17 (1978). For an interesting discussion of even earlier public concern about violence in the media see Krattenmaker & Powe, *supra* at 1288–92 (public outcry concerning violence in motion pictures and in comic books).

**6.** This section provides:

Nothing in this Act shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication.

utives; and (4) suggestions by Chairman Wiley to various NAB representatives that the NAB expedite its consideration of a proposal for a Code amendment incorporating the family viewing policy. For a detailed account of Chairman Wiley's and the FCC's informal campaign, see Appendix A. The campaign took place between October 1974 and April 1975. In April 1975 the NAB announced the family viewing policy.

## II. *THE DISTRICT COURT DECISION*

In this case plaintiffs mounted a frontal assault on the manner in which the FCC chose to carry out its statutory mandate to "generally encourage the larger and more effective use of radio in the public interest." 47 U.S.C. § 303(g). Plaintiffs argued, *inter alia*, that Chairman Wiley's informal tactics improperly pressured the networks and the NAB into adopting the family viewing policy; that the FCC's use of these tactics, rather than formal regulation to initiate change within the broadcast industry, violated the First Amendment and section 326 of the Federal Communications Act; and that the FCC in effect implemented a new "public" policy through informal pressure, and thereby failed to comply with the procedural requirements of the APA.

### A. *District Court's Ratio Decidendi.*

To encapsulate the essence of plaintiffs' arguments and the district court's ratio decidendi is not easy. We may begin by sketching briefly a holding of the Supreme Court in *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The Court held that an action against S. H. Kress & Co. under 42 U.S.C. § 1983 would lie if Adickes could show that Kress had refused to serve her "because of a state-enforced custom of segregating the races in public restaurants." *Id.* at 171, 90 S.Ct. at 1615. This showing would demonstrate a denial of equal protection under the color of a custom of the state. A private defendant in this manner became a participant in joint activity with the state and was thus liable under 42 U.S.C. § 1983.

This analytic structure was employed by the court below. It first enunciated the bedrock principle that the right and duty to make independent decisions regarding access to the television screen rests with the "hundreds of different licensees." 423 F.Supp. at 1134. The principle is elaborated in the following quotation from the district court's opinion:

> The right and duty to make independent and final decisions as to who shall and who shall not get access to the media resides not with the networks (except in their capacity as owners of local stations), not with the NAB, not with the FCC, not with the screen writers, director or actors, not with Norman Lear or Tandem Productions and not with this or any other court. The constitutionality of the broadcasting system depends on the conclusion that the right and duty to make these decisions reside in hundreds of different licensees.

*Id.*

The district court next concluded that government pressure substantially caused the adoption of the family viewing policy which deprived the individual licensees of their right and duty to make independent decisions. This deprivation violated the First Amendment. Governmental action exists because of governmental pressure which, as the district court saw it, functioned here as did state-enforced custom in *Adickes.* Because the government pressure was that of the FCC, an agency of the United States, the district court then fashioned a cause of action for damages against the private defendants based on *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *Bivens* to this case became what 42 U.S.C. § 1983 was to *Adickes.* The similarity of this case to *Adickes* thereby appears close. The liability of private parties for constitutional violations induced by governmental pressure, in *Adickes* derived from custom and here from jawboning, follows easily from modes of relief designed to provide a remedy for deprivations of constitutional rights. The finding of a violation of the APA by the FCC also follows naturally.

The validity of the district court's analysis fundamentally depends upon whether its bedrock principle is correct and whether its finding of causation is sound. We are not as certain as the district court was. For this reason, as well as for certain more specialized reasons to be developed below, we believe that primary jurisdiction to consider plaintiffs' challenges rests with the Commission. Before turning to our discussion of primary jurisdiction we should point out that the district court's holdings on the liability issues presented in the case are set forth briefly in Appendix B; this restatement of the holdings can only provide a glimpse of the district court's reasoning, the full force of which only a reading of the opinion below can provide. We shall set forth the court's holdings on the jurisdictional issues in the following paragraphs. Nevertheless, perusal of Appendix B should, when taken with the discussion that follows, illustrate the extent to which the district court thrust itself into the "delicately balanced system of [broadcast] regulation." *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 102, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973) (*CBS v. DNC*).

### B.  *Jurisdictional Issues.*

The disposition by the district court of defendants' jurisdictional arguments was consistent with, and inseparable from, its holdings on liability. At the outset the district court rejected defendants' contentions that under the existing broadcast regulatory scheme, plaintiffs' First Amendment and APA challenges to the FCC actions should have been pursued initially before the agency, and thereafter on review to a court of appeals. The court acknowledged that the statutory review procedure set out in 47 U.S.C. §§ 402(a), 405 and 28 U.S.C. § 2342 was "fashioned . . . to take advantage of the Commission's expertise and to foster a unified approach to the development of communications law," and is the "established, routine . . . method of challenging orders, decisions, reports, and other actions of the Commission." 423 F.Supp. at 1075–76. Nevertheless, the

court concluded that this statutory route did not provide the exclusive avenue of relief for plaintiffs because (1) the FCC actions complained of did not occur in any "proceeding" as that term is used in 47 U.S.C. § 405; hence, plaintiffs were not obligated to file a petition for rehearing with the Commission prior to seeking judicial review, 423 F.Supp. at 1075–78; (2) the FCC actions complained of did not constitute "orders" within the meaning of 47 U.S.C. § 402(a) or 28 U.S.C. § 2342, which grants exclusive jurisdiction to a court of appeals, because the actions did not result in a "formal agency mandate issued at the culmination of some regular agency proceeding," 423 F.Supp. at 1079–80; (3) the FCC actions complained of did amount to "agency action" within the meaning of 5 U.S.C. §§ 551(13), 702, and 703, for which judicial review in the district courts was available unless the doctrine of exhaustion of administrative remedies was applicable, 423 F.Supp. at 1085–86 § n.24; and (4) plaintiffs' constitutional claims were reviewable in the district court when the FCC actions complained of did not amount to final orders reviewable in a court of appeals, the doctrine of exhaustion of administrative remedies was inapplicable, and the FCC lacked the power to award damages for the alleged violations. *Id.* at 1086–89.

The court further acknowledged that "the existence of serious constitutional issues may be a factor encouraging exhaustion [of administrative remedies] in circumstances where the necessity of deciding such issues may be obviated by an administrative grant of relief on non-constitutional grounds," and that "orderly administrative procedures may [not] be bypassed automatically merely because the plaintiff claims that a particular administrative action is unconstitutional or otherwise in excess of its statutory powers." *Id.* at 1082, 1083 n.21. The court nonetheless rejected defendants' contention that plaintiffs had not exhausted their administrative remedies prior to instituting these actions in the district court. Exhaustion was unnecessary, the court concluded, because (1) the FCC

was "palpably without jurisdiction to interfere with broadcaster decisionmaking in the manner complained of," (the bedrock principle once more), *id.* at 1083; (2) the FCC was biased and had already prejudged the issues, so that resort to the Commission would be futile, *id.* at 1081–82; (3) the FCC had imposed an immediate burden on the exercise of important rights, *id.* at 1082; and (4) the FCC lacked the power to provide plaintiffs an adequate remedy, since it lacked the power to award damages, *id.* at 1088. As shall appear below, we have strong reservations about the validity of the first three reasons.

Finally, the court addressed defendants' contention that the doctrine of primary jurisdiction obligated the court to refer plaintiffs' claims to the FCC for an initial determination. The court earlier had concluded that the FCC was the "primary and exclusive forum" for initiating complaints based upon alleged FCC violations of section 326 of the Federal Communications Act because the Act did not give rise to a private cause of action and dismissed plaintiffs' claim based thereon. 423 F.Supp. at 1084. As to plaintiffs' First Amendment and APA claims, however, the court stated that: (1) "[N]othing would be served by having the FCC determine the factual questions surrounding the adoption of the family viewing policy," *id.* at 1090, even though the FCC possessed "recognized expertise in balancing the delicate First Amendment considerations involved in the television industry," *id.*; (2) "the First Amendment legal questions raised either involve no special FCC expertise (*e. g.*, state action and remedies) or are not in controversy (*e. g.*, the lack of FCC power to censor protected material)," *id.*; and (3) the issues involved in the case "are simply not the kind of questions which need 'be considered by the Commission in the interests of a uniform and expert administration of the regulatory scheme,'" *id.* (quoting *United States v. Western Pacific Railroad*, 352 U.S. 59, 65, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)). We strongly disagree with each of these conclusions with respect to the First Amendment and APA claims.

## III. *PRIMARY JURISDICTION*

The district court's findings of fact and conclusions of law on the liability issues, *see* Appendix B, make clear that it believed the FCC not only acted in an unconstitutional manner but also disregarded the requirements of the APA as well. That is, it achieved an improper goal in an improper manner. The court's conclusions strike at the very core of the pervasive issue concerning the scope of the FCC's power in regulating broadcasting and put at issue a technique of governing, *viz.*, jawboning, that under one name or another has long been in use in government generally.

These are serious issues; yet both pertain to matters of great concern to the FCC and with respect to which it has special competence. Perhaps the district court is right and our reservations with respect to its fundamental holdings are without substance. Nonetheless, we cannot believe that the ultimate judicial resolution of these issues will not be aided by the FCC's thorough consideration of them. Then, and only then, should courts step with even modest confidence into these sensitive and difficult areas.

We acknowledge that were we able to accept as correct beyond challenge the district court's bedrock principle we would perceive less need of deference to the FCC's primary jurisdiction. However, the licensees are to a degree trustees for the benefit of the public and subject to reasonable regulations having as a goal or regime of law "compatible with the First Amendment rights of the public and the licensees." *CBS v. DNC*, 412 U.S. at 132, 93 S.Ct. at 2101 (1973). In the conflict of interests within the television industry between licensees, networks, broadcasters, writers, actors, producers, and the public, it must be remembered that the Communications Act makes the interests of the public paramount. *Id.* at 122, 93 S.Ct. 2080. In *CBS v. DNC*, the Supreme Court emphasized that the present system of broadcast regulation strikes a balance between private and public control of the broadcast spectrum.

Balancing the various First Amendment interests involved in the broadcast media and determining what best serves the public's right to be informed is a task of great delicacy and difficulty. The process must necessarily be undertaken within the framework of the regulatory scheme that has evolved over the course of the past half-century. For, during that time, Congress and its chosen regulatory agency have established a delicately balanced system of regulation intended to serve the interests of all concerned. . .

The regulatory scheme evolved slowly, but very early the licensee's role developed in terms of a "public trustee" charged with the duty of fairly and impartially informing the public audience. In this structure the Commission acts in essence as an "overseer," but the initial and primary responsibility . . . rests with the licensee. This role of the Government as an "overseer" and ultimate arbiter and guardian of the public interest and the role of the licensee as a journalistic "free agent" call for a delicate balancing of competing interests. The maintenance of this balance for more than 40 years has called on both the regulators and the licensees to walk a "tightrope" to preserve the First Amendment values written into the Radio Act, and its successor, the Communications Act.

*Id.* at 102, 117, 93 S.Ct. at 2086, 2094.
Invocation of the primary jurisdiction doctrine provides a needed opportunity to obtain an explicit and well articulated determination by the FCC of whether its actions under Chairman Wiley properly walked the "tightrope." The classic statement of the principle underlying the primary jurisdiction doctrine was stated by Mr. Justice Frankfurter in *Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952):

Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

Although the doctrines of primary jurisdiction and exhaustion of administrative remedies serve cognate ends, *Western Pacific Railroad, supra,* distinguishes them in the following manner:

"Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. *General American Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 433 [60 S.Ct. 325, 331, 84 L.Ed. 361].

*Western Pacific Railroad, supra,* 352 U.S. at 63–64, 77 S.Ct. at 165. Thus, even if our reservations regarding the district court's refusal to find that the plaintiffs had failed to exhaust available administrative remedies are unsound, we are convinced that primary jurisdiction in this proceeding belongs in the FCC.

Our conclusion, although firm and fixed, is reached in full realization of the considerable force of the district court's contrary view. That view rests on assertions that (1) the position of the FCC was already clear, (2) the views of the FCC could be presented in this case as well as in a formal administrative proceeding, (3) the FCC possessed no special expertise in formulating "a theory of governmental action under the First Amendment or [fashioning] appropriate remedies," 423 F.Supp. at 1091, and (4) the

FCC cannot adjudicate a charge of "serious misconduct" involving itself and its Chairman, *id.*

The first of these propositions overstates the facts, while the second ignores the ordinary constraints imposed as a result of being a party to litigation. The position of the FCC *in this lawsuit* is clear enough and the activities of Chairman Wiley are beyond dispute. It is not known, however, what the position of the FCC would have been, or in the future will be, when confronted by the plaintiffs' claims in a proper administrative proceeding. Such a proceeding will make possible a range of responses by the FCC that are either foreclosed or made tactically difficult in the setting of this lawsuit as it developed in the trial court. Children shortly after leaving the cradle understand the difference between being forced to defend against a charge of naughtiness and being asked to consider whether they thought they had been nice. In the latter posture their response is much more likely to be open and forthcoming. Human psychology does not change too much between the cradle and the grave.

■ As to the third proposition, we simply have less confidence in the district court's bedrock principle than it does. Enough has already been said to indicate that there presently exist constraints on the right of individual licensees to present on the air such matters as they wish. Well known are the ramifications of the Fairness Doctrine, *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the Commission's rules regarding cigarette advertising, *Banzhaf v. FCC*, 132 U.S.App.D.C. 14, 405 F.2d 1082 (D.C.Cir. 1968), and the Commission's position with respect to indecent language, *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). It simply is not true that the First Amendment bars *all* limitations of the power of the individual licensee to determine what he will transmit to the listening and viewing public. At issue in this case is whether a family viewing hour imposed by the FCC would contravene the First Amendment. This is a con- siderably more narrow and precise issue than is the district court's bedrock principle and with respect to which the FCC's expertise and procedures could provide enormous assistance to the judiciary.

The district court's fourth assertion on which it rested its rejection of the primary jurisdiction doctrine falls of its own weight once the district court's findings regarding liability are put in doubt. The FCC and its Chairman engaged in "serious misconduct" only if the law is as the district court found it. Weaken that foundation and what appeared as "serious misconduct" looks more like, at worst, jawboning of the type often praised as effective leadership by those satisfied with its results and condemned as unprincipled administration by those who disapprove of those results.

Jawboning relates, of course, to the district court's holding that the Commission violated the APA in its use of informal procedures in the manner described above. The technique raises serious issues. It is not surprising that the Commission often seeks to "chart a workable 'middle course' in its quest to preserve a balance between the essential public accountability and the desired private control of the media." *CBS v. DNC*, 412 U.S. at 120, 93 S.Ct. at 2095. One such "middle course" has been the tendency of the FCC to rely upon self-regulation by the broadcast industry to promote the public interest, a practice that has possibly had the salutary effect of diminishing the need for formal governmental intervention and regulation. *See, e. g., ACT, supra.* Moreover, reliance upon self-regulation no doubt has relieved both the FCC and the industry of the need to confront the dilemma of delineating the precise extent of the agency's formal regulatory authority in various areas. Hence, informal discussions between the Commission and members of the industry that lead to self-regulation constitute but one aspect of the ongoing effort by both the government and the licensees to negotiate the regulatory "tightrope" on which they confront one another. *See CBS v. DNC*, 412 U.S. at 117, 93 S.Ct. 2080.

We acknowledge that informal procedures permit the FCC to exercise "wide-ranging and largely uncontrolled administrative discretion in the review of telecommunications programming" which can be used to apply "sub silentio pressure" on broadcast licensees. Bazelon, *FCC Regulation of the Telecommunications Press*, 1975 Duke L.J. 213, 215.[7] Regulation through "raised eyebrow" techniques or through forceful jawboning is commonplace in the administrative context,[8] and in some instances may fairly be characterized, as it was by the district court in this case, as official action by the agency.[9]

█ While we agree that the use of these techniques by the FCC presents serious issues involving the Constitution, the Communications Act, and the APA,[10] we nevertheless believe that the district court should not have thrust itself so hastily into the delicately balanced system of broadcast regulation. Because the "line between permissible regulatory activity and impermissible 'raised eyebrow' harassment of vulnerable licensees" is so exceedingly vague, *Bazelon, supra,* 1975 Duke L.J. at 217, it is important that judicial attempts to control these techniques be sensitive to "the particular regulatory context in which it occurs, the interests affected by it, and the potential for abuse." *Consolidated Edison Co. v. FPC,* 168 U.S.App.D.C. 92, 101, 512 F.2d 1332, 1341 (D.C.Cir.1975) (footnote omitted). The

---

7. *See Illinois Citizens Committee for Broadcasting v. FCC*, 169 U.S.App.D.C. 166, 176–79, 194, 515 F.2d 397, 407–10, 425 (D.C.Cir.1975) (Statement of Bazelon, C. J., concerning why he voted to grant rehearing en banc); *Yale Broadcasting Co. v. FCC*, 155 U.S.App.D.C. 390, 399, 478 F.2d 594, 603 (D.C.Cir.) (Statement of Bazelon, C. J., concerning why he would grant rehearing en banc, *sua sponte*), *cert. denied*, 414 U.S. 914, 94 S.Ct. 211, 38 L.Ed.2d 152 (1973); *Brandywine-Main Line Radio, Inc. v. FCC*, 153 U.S.App.D.C. 305, 366 n.60, 473 F.2d 16, 77 n.60 (D.C.Cir.1972) (Bazelon, C. J., dissenting), *cert. denied*, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973); Robinson, The FCC and the First Amendment: Observations on 40 Years of Radio and Television Regulation, 52 Minn.L.Rev. 67, 118–27 (1967).

8. *See, e. g., United Steelworkers v. Weber,* —— U.S. ——, 99 S.Ct. 2721, 2737–38 & n.2, 61 L.Ed.2d 480 (1979) (Rehnquist, J., dissenting) (affirmative action plan adopted under pressure from Office of Federal Contract Compliance Programs); *ACT, supra,* 183 U.S.App.D.C. at 452, 564 F.2d at 473 n.27 (FCC jawboning to induce self-regulation in children's programming area); *Hercules, Inc. v. FPC,* 552 F.2d 74, 77–78 (3d Cir. 1977) (FPC jawboning to establish pipeline curtailment priorities in accordance with FPC policy when FPC lacked power to impose own curtailment plans without prior notice and hearing); *Consolidated Edison Co. v FPC,* 168 U.S.App.D.C. 92, 101, 512 F.2d 1332, 1341 (D.C.Cir.1975) ("Regulation through 'raised eyebrow' techniques seems inherent in the structure of most administrative agencies, combining as they do both policy-making and adjudicative functions."); *Consumers Union of U. S., Inc. v. Kissinger,* 165 U.S.App.D.C. 75, 82, 506 F.2d 136, 143 (D.C.Cir.1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2406, 44 L.Ed.2d (1975) (Executive Department efforts to reduce steel imports via "voluntary imports restraints.") ("[N]othing in the process leading up to the voluntary undertakings or the process of consultation under them differentiates what the Executive has done here from what all Presidents, and to a lesser extent all high executive officers, do when they admonish an industry with [an] express or implicit warning that action, within either their existing powers or enlarged powers to be sought, will be taken if a desired course is not followed voluntarily.") *See also AFL–CIO v. Kahn,* No. 79–1564 (D.C.Cir. June 22, 1979), *cert. denied,* —— U.S. ——, 99 S.Ct. 3107, 61 L.Ed.2d 879 (1979) ("Voluntary" wage-price program not "mandatory" economic control within meaning of § 3(b) of Council on Wage and Price Stability Act).

9. "The Commission approved of his activities before the fact, permitted him to engage in activities which they knew would be perceived as regulatory moves by the agency, were regularly kept abreast of the developments, and provided input into the process." 423 F.Supp. at 1122. *See id.* at 1077 n.13, 1120–23, 1130. *But see Illinois Citizens Committee for Broadcasting, supra,* 169 U.S.App.D.C. at 171, 515 F.2d at 402 (speech by FCC Chairman Burch not "agency action").

10. Courts are becoming increasingly more sensitive both to the innuendo inherent in the relationship between regulators and regulatees as well as to the need to formulate appropriate limits on *ex parte* contacts between an agency and those whom it is charged to regulate. *See generally Home Box Office, Inc. v. FCC,* 185 U.S.App.D.C. 142, 184–192, 567 F.2d 9, 51–59 (D.C.Cir.1977); *ACT, supra,* 183 U.S.App.D.C. at 447–57, 564 F.2d at 468–78; *Moss v. Civil Aeronautics Board,* 139 U.S.App.D.C. 150, 156–161, 430 F.2d 891, 897–902 (D.C.Cir.1970).

development of standards governing the agency's use of informal methods to influence broadcast industry policy is an issue "that should be dealt with in the first instance by those especially familiar with the customs and practices of the industry." *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 305, 93 S.Ct. 573, 582, 34 L.Ed.2d 525 (1973). *See also CBS v. DNC*, 412 U.S. at 102–03, 93 S.Ct. 2080. Deferral to the FCC is, we believe, essential to further the purposes of the delicately balanced system of broadcast regulation. *See* L. Jaffe, *Judicial Control of Administrative Action* 158–59 (1965); Note, *Jurisdiction to Review Federal Administrative Action: District Court or Court of Appeals*, 88 Harv.L.Rev. 980, 984 (1975). Hence, primary jurisdiction over plaintiffs' challenges to the official agency action complained of in this case as a violation of the APA rests with the FCC.

In conclusion, we think it appropriate to note our support for the following views expressed by the District of Columbia Circuit Court in *ACT*, another case in which FCC jawboning activities were involved:

> The Commission, as the expert agency entrusted by Congress with the administration and regulation of the crucial, dynamic communications field, required and deserves some latitude in carrying out its substantial responsibilities. It may not be the sole guardian of the public's interest in broadcasting—licensees, the courts and the general public in varying ways share responsibility with it for defining and advancing that interest—but, in the formulation of broadcast policy, the Commission nevertheless must continue to play a leading role.
>
> If our relationship with the Commission and other federal agencies is to remain a partnership, we may not succumb

to the temptation of casting ourselves in the unsuited role of *primus inter pares.* 183 U.S.App.D.C. at 461, 564 F.2d at 482.

Accordingly, we vacate the judgment of the district court and remand with instructions to refer plaintiffs' claims against the government defendants to the FCC, and to hold in abeyance plaintiffs' claims against the private defendants pending resolution and judicial review of the administrative proceedings before the FCC.

Vacated and Remanded.

### APPENDIX A

The following paragraphs provide a reasonably complete chronological account of the major events, as established by the district court, 423 F.Supp. at 1092–1128, that occurred prior to the formal adoption by the NAB of the family viewing policy.

Chairman Wiley's initiative began October 10, 1974, when he delivered a speech to the Illinois Broadcasters Association in which he focused on "the question of violence and obscenity on television—particularly as to the effect of such presentations on our children.[11] He reminded the broadcasters of their "public accountability" and "special" responsibilities as licensees, stating that "[i]f self-regulation does not work, governmental action to protect the public may be required—whether you like it or whether I like it." He emphasized that the issue of sex and violence on television was on the "front-burner of a rather 'well-heated' Chairman's desk at the FCC," and called for broadcasters to employ "intelligent scheduling, appropriate warnings, and perhaps, even some kind of industry-administered rating program . . . ." Chairman Wiley referred to an earlier speech that he had given in Atlanta in which he had advocated fewer commercials during children's television programming, applaud-

---

**11.** Earlier, in August 1974, Lawrence Secrest, Legal and Administrative Assistant to Chairman Wiley, delivered a written proposal to the NAB's general counsel, requesting the NAB to strengthen its position on televised violence by reinstating language that earlier had appeared in the NAB Television Code. The NAB Television Code Review Board considered the pro-

posal at its October 1–2, 1974 meeting, and rejected it. Although the topic of televised violence was discussed at the meeting, the district court characterized this meeting as "part of the continuing dialogue about the question of television programming," rather than as part of Chairman Wiley's initiative to the networks and the NAB. 423 F.Supp. at 1096.

ed the industry amendments to the Television Code that had occurred after that speech, and stated that he was "optimistic that the combined effect of government encouragement and enlightened self-regulation will bring about constructive change in this very important aspect of public service."

On November 7, 1974, Chairman Wiley made the first of several personal lobbying efforts when he and members of his staff met with the Washington vice presidents of ABC, CBS, and NBC. He emphasized the need for action to reduce violent and sex-related programming on television, and proposed, *inter alia,* that each network issue a policy statement setting forth its position on televised violence and obscenity, that the stated policies include a provision for cautionary warnings to be televised whenever a program posed a problem, and that programs for which warnings were needed be scheduled for viewing later in the evening.

A second meeting occurred on November 22, 1974, when Chairman Wiley and FCC staff members met for two hours in the Chairman's office with the presidents of the networks and other network executives. Chairman Wiley directed attention to the existence of a serious problem concerning " 'undue violence' and 'fairly explicit' sexual material" on television. He again stressed the importance of confining shows that might prove harmful to children to the later evening hours and the desirability of providing warnings before showing particularly sensitive material. He reemphasized the need for some action in this area, indicating that the Commission was reluctant for legal and policy reasons to promulgate specific programming rules. He suggested that the networks issue a joint policy statement on the subject of televised sex and violence, and that the NAB express a new position in its Television Code. Arthur Taylor, the President of CBS, made it clear that he thought an industry-wide solution was necessary to deal with the problem. Chairman Wiley endorsed an industry-wide approach and commented that industry-wide compliance might be encouraged by including in license renewal forms new questions on sta-

tions' policies regarding the scheduling of programs containing sex or violence, or by issuing a general policy statement similar to the one issued in the children's television programming/advertising area, outlining what was expected of licensees regarding sex and violence, particularly when significant numbers of children were in the audience. The meeting concluded with the understanding that each network would send the FCC a statement of its current standards, that the FCC staff would meet with network officials in charge of broadcast standards, and that the participants in the November 22 meeting would meet again at a later date.

On November 29, 1974, former FCC Commissioner Nicholas Johnson, in his capacity as chairman of the National Citizen's Committee for Broadcasting, wrote to Chairman Wiley asking that the Commission "afford the National Citizens Committee for Broadcasting or other representatives of the public the right to observe any further negotiations between the Commission and the television networks with respect to so-called 'sex and violence' in programming." Wiley refused, stating that he did not believe "any useful purpose could be served by opening these meetings to outside groups such as your own."

On December 10 and 11, 1974, members of the FCC staff met separately with executives responsible for program standards at each of the networks. In these sessions the FCC sought to clarify its position, to achieve an understanding of how the networks would apply a new scheduling policy to specific programs, and to learn more about the programming practices of the networks. On December 17, 1974, the same FCC staff members met with Chairman Wiley to review the current status of the discussions with the networks. The consensus of the group was that the networks had the idea that any further move by the Commission would appear heavy-handed, that the networks knew of the approaching December 31 deadline for the FCC's report to Congress, and that no "reminder" of the urgency of the situation was necessary. In

view of the ongoing industry effort to deal with the problems, Wiley requested and received a postponement of the deadline for submitting the FCC report to Congress from December 31, 1974 to February 15, 1975.

On December 30, 1974, Arthur Taylor, president of CBS, sent a letter to Wayne Kearl, chairman of the NAB Television Code Review Board, in which CBS proposed that the NAB Code be amended to reflect the principle that "[p]rogramming in the first hour of the network prime-time schedule should be suitable for family viewing." On the same day, the CBS proposal was released publicly and NBC issued a press release stating that its current schedule "reflects the policy of opening its prime time programming with series suitable for family viewing . . . . NBC intends to continue this policy, whether or not the NAB Code is amended to include a provision along these lines." On January 2 or 3 NBC issued another press release, dated January 6, 1975, in which it announced that it "plan[ned] to devote the first hour of its prime time network schedule to programming suitable for general family viewing."

On January 7, 1975, the NAB Television Code Review Board met in a special session requested by CBS, to consider the CBS proposal for a "family viewing hour." The Board took no formal action on the proposal but instead passed a resolution directing the Program Standards Committee to "review and to make recommendations affecting (1) principles relating to the scheduling of programs in early evening prime-time periods and (2) the use of suitable advisory legends as to the nature of program content." The group "agreed" that the resolution "[did] not commit the Program Standards Committee to recommend any specific action." The Committee was obligated only to present a report to the Television Code Review Board during the NAB convention in April 1975.

On January 8, 1975, ABC announced that "the first hour of each night of its prime time network entertainment schedule will be devoted to programming suitable for general family audiences starting with the new television season in the fall of 1975." ABC's announcement also contained the following statement:

We wish to emphasize the necessity to preserve the basic rights of freedom of expression under the Constitution and under the Communications Act. Government action in the area of program content must be both cautious and carefully limited lest we do permanent damage to the principles of free expression which are so fundamental to our society. All Americans recognize, we are sure, that these are sensitive and fragile concepts. Accordingly, ABC strongly supports the concept of self-regulation.

On January 9, 1975, Chairman Wiley and the FCC staff met again with the participants in the November 22 meeting. The president of the NAB and the Senior Executive Vice President for Governmental Relations of the NAB attended the meeting as well, by invitation of Chairman Wiley. He sought to facilitate an expeditious adoption of the family viewing policy, to clarify various aspects of the policy, and to encourage extension of the policy to the first two hours of prime time programming. He also inquired whether it would be possible to secure NAB Board approval of the proposal prior to the April convention, given that the FCC had to report to Congress in mid-February.

On January 15, 1975, the NAB Television Board of Directors met and passed a resolution which provided in part that:

The Television Board of Directors of the NAB commends the three television networks for their individual actions with respect to programming in the initial hour of network prime time. At the same time, mindful of the keen interest in the subject, the Board recommends that the Television Code Review Board direct its Program Standards Committee to expedite as much as possible its review and recommendations affecting (1) principles relating to the scheduling of programs in early evening prime time periods, and (2) the use of suitable advisory

legends as to the nature of program content. . . .

The Board requests the Television Code Review Board to meet on or before February 15, 1975, to consider these recommendations.

The Program Standards Committee of the Code Review Board subsequently met on January 28, 1975, to consider what role the NAB should assume concerning the family viewing policy, and passed the following resolution:

Because several constructive proposals were proffered as to the approach to be taken by the Television Code Review Board in response to the NAB Television Board of Directors' resolution, the Program Standards Committee recommends that the same be presented to the full Television Code Review Board for its review and resolution.

The Television Code Review Board met on February 4, 1975, and adopted the following statement as a proposed amendment to the NAB Television Code:

Additionally, entertainment programming inappropriate for viewing by a general family audience should not be broadcast during the first hour of network entertainment programming in prime time and in the immediately preceding hour. In the occasional case when an entertainment program in this time period is deemed to be inappropriate for such an audience, advisories should be used to alert viewers. Advisories should also be used when programs in later prime time periods contain material that might be disturbing to significant segments of the audience.

These advisories should be presented in the audio and video form at the beginning of the program and when deemed appropriate at a later point in the program. Advisories should also be used responsibly in the promotion material in advance of the program. When using an advisory, the broadcaster should attempt to notify publishers of television program listings.

On February 10, 1975, Chairman Wiley addressed the National Association of Television Program Executives and emphasized that "the question of what is appropriate for family viewing necessarily must be judged in highly subjective terms" and that "the lack of an acceptable objective standard is one of the best reasons why—the Constitution aside—I feel that self-regulation is to be preferred over the adoption of inflexible governmental rules." Wiley spoke out again on February 13, 1975 in a speech before the Radio and Television Commission of the Southern Baptist Convention:

A number of interested citizens and some members of Congress contend that the problem of violence on·television is so serious as to warrant some remedial action by the Federal Communications Commission. While I understand and share such concern, I cannot agree that specific governmental regulation in this highly sensitive First Amendment area would be desirable at the present time. Instead, my view has been that the FCC—in the discharge of its public interest responsibilities and consistent with its authority under the Communications Act—can play a constructive role at this point by focusing increased industry attention on the issue and by encouraging the consideration of self-regulatory reforms. . . .

Recent events make it appear that out initiative has been successful and that the broadcast industry intends to regulate itself in order to obviate the need or demand for governmental action in this area.

On February 19, 1975, the FCC submitted its Report to Congress. *See Report on the Broadcast of Violent, Indecent, and Obscene Material,* 51 F.C.C.2d 418 (1975). The Report recounted the longstanding public and congressional concern with the effects of television on young people, mentioned the growing number of complaints about violent and sexually-oriented programs filed with the Commission, and noted the receipt of various petitions to deny broadcast license renewals as well as petitions for rulemaking in the area of televised violence.

*Id.* at 418–19. The FCC Report reiterated the theme emphasized by Chairman Wiley throughout the previous five months, *i. e.,* that industry self-regulation was preferable to formal governmental action in this area.

> With respect to the . . . question of what is *appropriate* for viewing by children, the Commission is of the view that industry self-regulation is preferable to the adoption of rigid governmental standards. We believe that this is the case for two principal reasons: (1) the adoption of rules might involve the government too deeply in programming content, raising serious constitutional questions, and (2) judgments concerning the suitability of particular types of programs for children are highly subjective. As a practical matter, it would be difficult to construct rules which would take into account all of the subjective considerations involved in making such judgments. We are concerned that an attempt at drafting such rules could lead to extreme results which would be unacceptable to the American public.

*Id.* at 419.

> Regulatory action to limit violent and sexually-oriented programming which is neither obscene nor indecent is less desirable than effective self-regulation, since government-imposed limitations raise sensitive First Amendment problems. In addition, any rule making in these areas would require finding an appropriate balance between the need to protect children from harmful material and the adult audience's interest in diverse programming. Government rules could create the risk of improper governmental interference in sensitive, subjective decisions about programming, could tend to freeze present standards and could also discourage creative developments in the medium.

*Id.* at 419–20 (footnotes omitted).

The Report then outlined the actions taken by Chairman Wiley in his attempt to "serve as a catalyst for the achievement of meaningful self-regulation." *Id.* After noting the publication of network policy statements concerning program guidelines and the adoption of the proposed amendment to the NAB Television Code, the Report concluded that:

> This new commitment suggests that the broadcast industry is prepared to regulate itself in a fashion that will obviate any need for governmental action in this sensitive area. . . .
>
> [W]e believe the new guidelines represent a major accomplishment for industry self-regulation, and we are optimistic that these principles will be applied in a responsible manner which will be acceptable to the American people.

*Id.* at 422, 424.

On March 24, 1975, Chairman Wiley and members of his staff met with the President of the Association of Independent Television Stations (INTV) to discuss the application of the family viewing policy to independent stations.[12] One of the primary topics of concern to the independent stations was the fact that many stations had long-term contractual obligations to broadcast programs which probably could not meet the Code Review Board's proposed requirements.

On April 8, 1975, the NAB Television Board of Directors formally adopted the family viewing policy as an amendment to the Television Code.[13]

### APPENDIX B

In its discussion of the liability issues presented in the case, the district court reached the following conclusions which also rest on the bedrock principle already referred to.

1. Individual broadcast licensees have both the right and the duty to exercise

---

12. The Commission had indicated in its Report to Congress that it intended to discuss the family viewing policy with INTV representatives. 51 F.C.C.2d at 422 n.11.

13. The Board also approved an amendment designed to minimize the contract problems of the independent stations, as well as a general clause which cautioned against the exploitative use of program warnings.

independent judgment about what constitutes programming in the public interest. *Id.* at 1072.

2. The FCC improperly interfered with the broadcasters' right/obligation to engage in independent decisionmaking. *Id.* at 1072–73.

3. The FCC violated the First Amendment by threatening the possibility of regulatory action should the broadcast industry not adopt the family viewing policy. *Id.* at 1073, 1094, 1142, 1146–51, 1161.

a. The FCC may offer suggestions when it believes that it has information or ideas which broadcasters may wish to consider in making their independent determination concerning what programming is in the public interest. *Id.* at 1150.

b. The FCC has no right, however, to accompany its suggestions with vague or explicit threats of regulatory action should broadcasters consider and reject the Commission's suggestions. *Id.* at 1146, 1150, 1161.

c. The FCC has no right to demand or secure commitments from broadcasters that its suggestions be accepted. *Id.* at 1150.

d. The FCC has no right to launch orchestrated campaigns to pressure broadcasters to do what they do not wish to do. *Id.*

e. When the FCC makes recommendations in areas where the power to regulate formally is questionable, the FCC must avoid any appearance or suggestion of pressure. *Id.*

f. FCC suggestions not accompanied by clear and unequivocal denials of an intent to regulate give the appearance of threats. The Commission and its representatives must avoid the appearance of impropriety. *Id.* at 1157.

g. The meetings between Chairman Wiley and the industry representatives were "extraordinary, unnecessary to achieve an objective of merely making suggestions, sure to generate undue pressure and to create an appearance of im-

propriety, and strongly indicative of an FCC intent to compromise broadcaster decisionmaking." *Id.*

h. Although the FCC may be able to develop constitutional regulations which deal with the questions of violence or of programming for children in the early evening hours, the Commission has no authority to use the licensing process to control the depiction of violence or the presentation of adult material on television unless it first enacts valid regulations giving fair notice to licensees. *Id.* at 1073, 1149–50, 1155, 1161.

4. The FCC violated the APA by using informal pressure to negotiate new public policy without providing public notice and without affording any opportunity for interested parties to be heard. *Id.* at 1151–53, 1157, 1162.

a. The FCC here circumvented APA requirements by negotiating public policy behind closed doors. *Id.* at 1152.

b. Because the FCC acted in the exercise of its quasi-legislative powers while jawboning, it was obligated to comply with the requirement of 5 U.S.C. § 553. *Id.* at 1151.

c. Official FCC endorsements of and recommendations for change in industry policy must be made in compliance with APA procedures. *Id.* at 1157.

5. Broadcasters are free to adopt a policy such as the family viewing policy even if the source of the idea is governmental, and even if governmental officials have encouraged the policy, provided that their adoption of the policy is based on their own independent judgment that the policy promotes the public interest. *Id.* at 1072, 1130–40.

6. Broadcasters are not free, however, to program on any basis other than their own independent judgment about what constitutes good programming. Nor may they interfere with the independent decisionmaking of other broadcasters by seeking to impose a policy on another broadcast licensee. *Id.* at 1072, 1131, 1143. Broadcasters who fail to exercise independent program judgments and who

become surrogates in the enforcement of government policy violate the First Amendment. *Id.* at 1073, 1140–43.

7. The actions of the networks and the NAB constituted "governmental action" for purposes of the First Amendment both because adoption of the family viewing policy had been caused substantially by FCC pressure and because the networks, the NAB, and the FCC participated in an "unprecedented joint venture" to compromise the independent judgments of other broadcast licensees. *Id.* at 1094, 1140–46.

8. The networks and the NAB violated the First Amendment by "fail[ing] to exercise independent program judgments and instead becom[ing] surrogates in the enforcement of government policy" and by agreeing to compromise the independent programming judgments of individual licensees. *Id.* at 1073, 1140–46, 1154–55, 1161.

a. The adoption of the family viewing policy by each of the networks violated the First Amendment. *Id.* at 1143–46, 1161.

b. The adoption of the family viewing policy by the NAB violated the First Amendment. *Id.*

c. NAB attempts to enforce the family viewing policy in any way would violate the First Amendment. *Id.*

d. Networks are required to program independently and may not, without violating the First Amendment, enter into agreements with the NAB which condition their membership on adherence to the family viewing policy or enter into any other agreements which delegate their programming authority over family viewing matters to the NAB. The networks' delegation of that authority in this case violated the First Amendment. *Id.* at 1154, 1161.

e. The private defendants are liable for any financial damage which Tandem suffered as a result of the adoption of the

family viewing policy. *Id.* at 1157–58, 1162.