Joel LEVITCH et al., Plaintiffs,

v.

COLUMBIA BROADCASTING SYSTEM,
INC., et al., Defendants.

No. 78 Civ. 4264 (KTD).

United States District Court,
S. D. New York.

July 23, 1980.

Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York City, for plaintiffs; Eric M. Lieberman, Jules Lobel, Ellen J. Winner, Emily M. Bass, New York City, of counsel.

Lewis Kornhauser, Cravath, Swaine & Moore, New York City, for defendant, CBS, Inc.; Robert S. Rifkind, Robert D. Joffe, Jeffrey S. Facter, John D. Appel, Ralph E. Goldberg, Allen Y. Shaklan, Francesca Macartney Beale, New York City, of counsel.

Cahill Gordon & Reindel, Jay E. Gerber, Associate Gen. Counsel, Stephen F. Stander, Asst. Gen. Atty., New York City, for defendant National Broadcasting Co., Inc.; Floyd Abrams, Robert Usadi, Dean Ringel, New York City, of counsel.

Hawkins, Delafield & Wood, New York City, for defendant American Broadcasting Companies, Inc.; Philip R. Forlenza, W. Cullen MacDonald, June R. Grasso, New York City, of counsel.

Bergson, Borkland, Margolis & Adler, Washington, D. C. for defendant American Broadcasting, Inc. & WABC–T.V.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

This action was commenced by 26 independent film producers and directors against the three national broadcasting networks, Columbia Broadcasting System, Inc. ["CBS"], the National Broadcasting Company, Inc. ["NBC"], and the American Broadcasting Companies, Inc. ["ABC"], [hereinafter collectively referred to as the "network defendants"], and their New York licensed television stations, WCBS, WNBC and WABC, [hereinafter collectively referred to as the "station defendants"]. The complaint, as amended, charges the network and station defendants with various antitrust as well as fundamental constitutional violations and seeks monetary and injunctive relief.

### I. Parties and Background of this Action

The network defendants have been denominated by plaintiffs as the sole "national broadcasting systems" operating in the United States. In fact, the network defendants own and operate commercial television stations in only five of the nation's major cities–New York, Los Angeles, Chicago, Philadelphia and St. Louis–and collectively reach only 23 percent of the television viewing public.[1]

---

1. There are approximately 700 television stations in the United States which broadcast commercial television programs. Of these only 15 are owned and operated by the network defendants. The remaining stations are local broadcasters which, for the most part, are affiliated with one of the network defendants.

In order to reach the balance of the national viewing public, each of the network defendants depends upon the transmission of their programs, and advertisement messages, over local television stations. These local stations are independent television stations in that they are neither owned nor operated by any of the network defendants. They are located in cities other than those in which the network defendants own and operate stations. In part, these local stations air local programs, including locally produced news and documentaries, throughout their limited viewing area. However, through affiliation agreements with the network defendants, these local or affiliate stations have access to those programs, entertainment, news and documentaries, transmitted by CBS, NBC and ABC. In return, the network defendants have a national network of affiliates through which they are able to air their programs and, more importantly to them, the advertising messages of those sponsoring these programs.

Each of the network defendants have adopted a policy whereby they produce their own news and documentary programs. Only these in-house productions are aired by their own stations and offered by the network defendants to their affiliates for transmission.

The plaintiffs, a group of independent documentary producers–directors, take exception to the networks' policies of only using documentary programs which have been produced in–house. They charge that this policy of in–house production was the result of an agreement among the network defendants and/or their affiliates which was calculated to freeze the independent producers–directors out of the documentary film market and thereby monopolize this lucrative market for themselves. In addition, plaintiffs allege numerous other antitrust violations resulting from defendants' policy of in–house production. Finally, plaintiffs charge that by denying the independents access to the network–owned stations, as well as to their affiliates, the defendants have unconstitutionally abridged plaintiffs' First Amendment rights.

The defendants have moved, pursuant to Fed.R.Civ.P. 12(b), to dismiss the amended complaint in its entirety on the ground that it fails to state a claim upon which relief can be granted. In the alternative, the defendants have requested that I stay the instant proceedings and order the parties to litigate their differences before the Federal Communications Commission–an administrative and regulatory body legislatively charged with general supervisory powers over the broadcasting industry, [hereinafter referred to as the "FCC" or the "Commission"]. Plaintiffs, quite predictably, oppose the motion to dismiss as well as any stay of the instant proceeding pending FCC action.

By order dated April 14, 1980, I informed the parties that due to the nature of the claims before me, I intended to treat defendants' motion as one to dismiss or, in the alternative, as one for summary judgment. The parties were granted an opportunity to submit additional papers with respect to the motion for summary judgment.

Plaintiffs' amended complaint purports to state seven independent claims for relief. Upon closer analysis, however, it is quite apparent that plaintiffs have woven numerous theories of recovery into each claim. For example, plaintiffs' second claim charges defendants with violating § 2 of the Sherman Act, 15 U.S.C. § 2, § 3 of the Clayton Act, 15 U.S.C. § 14, as well as combining to infringe plaintiffs' First Amendment rights in violation of 42 U.S.C. § 1985.

As a result of this hopeless jumble of claims and theories of recovery, I am unable to treat each claim separately. Rather, I must address each of plaintiffs' theories of recovery in order to bring a semblance of cohesion to this otherwise confused and rambling complaint.

## II. *Plaintiffs' First Amendment Claims*

I turn first to consider the constitutional claims asserted by plaintiffs. When stripped of its hyperbole, plaintiffs' First Amendment claim, inextricably woven into their antitrust claims, charges that by vir-

tue of defendants' concerted efforts to exclude them from the lucrative documentary film market, defendants have denied them "access" to the national broadcasting systems. As part and parcel of this claim, plaintiffs charge that by denying them access to the national networks, the defendants have conspired to interfere with plaintiffs' civil rights in violation of 42 U.S.C. § 1985(3).

Although far from a novel legal theory, see, e. g., Columbia Broadcasting Systems, Inc. v. Democratic National Committee, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), plaintiffs have added a new twist to their "denial of access" claim by simultaneously charging a host of antitrust allegations. Nonetheless, I will endeavor to keep my sights fixed upon the First Amendment claim and not succumb, at least at this juncture, to the tangled antitrust web plaintiffs have attempted to weave around it.

In response to plaintiffs' denial of access claim, defendants charge that their conduct, even if accurately alleged, is itself protected by the First Amendment. In particular, they urge that the decisions of the network defendants to produce their own news and documentary programs in-house, is the very essence of a broadcaster's editorial prerogative. That is to say, it is one of many methods employed by the networks to pick and choose which news and documentary programs are to be transmitted over the necessarily limited air time allocated to these types of programs. They conclude that by requiring defendants to accept plaintiffs' documentary programs, which is in essence the relief plaintiffs seek, this Court will not only be usurping defendants' fundamental editorial authority, but will also be conducting a wholesale restructuring of the concept of broadcast journalism—a task properly left, in the first instance, to the FCC.

There can be no doubt that competing First Amendment rights obtain in the case at bar. On the one hand, the network defendants should be free to transmit the news and documentary programs they choose, despite the fact that these programs may have been created exclusively in-house. Likewise, plaintiffs must certainly be free to produce, direct and offer for sale, their own "public affairs" or documentary programs. However, the question remains whether a court, absent action by the FCC, should compel the purchase of independently produced documentary programs by the national networks.

I think this question demands a negative response. To be sure, a contrary result would indeed twist the First Amendment beyond recognition.

The First Amendment's guarantee of free speech is certainly one of the cornerstones of our free society. Thus, when faced with competing First Amendment rights, a court must tread carefully in balancing the competing interests—ever guarding against the infringement of genuine and concrete fundamental constitutional interests at the expense of vindicating abstract interests.

The courts have long recognized that "the broadcast media pose unique and special problems not present in the traditional free speech case." Columbia Broadcasting v. Democratic Committee, supra, at 101, 93 S.Ct. at 2086, citing, Red Lion Broadcasting Company v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). To be sure, the broadcasting media, unlike other medias, is subject to certain limitations by virtue of the paucity of broadcasting frequencies available in relation to those desirous of broadcasting. And, as a result, "there is also present an unusual order of First Amendment values." Columbia Broadcasting, supra, 412 U.S. at 101, 93 S.Ct. at 2086. Thus, in the context of the broadcasting industry, a unique balancing of competing First Amendment interests obtains.

In Columbia Broadcasting, supra, the Supreme Court considered the question of "whether a broadcast licensee's general policy of not selling advertising time to individuals or groups wishing to speak out on issues they consider important [violated] . . . the First Amendment." 412 U.S. at 97, 93 S.Ct. at 2084. The court, although recognizing that a broadcaster is not with-

out protection under the First Amendment, concluded that "[i]t is the right of the viewers and listeners, not the right of the broadcasters, which is paramount . . . . It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here." *Columbia Broadcasting, supra*, at 102, 93 S.Ct. at 2086, *quoting, Red Lion Broadcasting, supra*, 395 U.S. at 390, 89 S.Ct. at 1806.

Thus, under the balancing test formulated in *Red Lion*, and reaffirmed in *Columbia Broadcasting*, even conceding the competing First Amendment rights of plaintiffs and defendants, it is the right of the public to view news and documentary programs which is paramount. And, it is the alignment of the public's interest which must control.

■ Although quick to espouse this unique First Amendment balancing test, the Supreme Court was equally quick to note that "[b]alancing the various First Amendment interests involved in the broadcast media and determining what best serves the public's right to be informed is a task of . . . great delicacy and difficulty." 412 U.S. at 102, 93 S.Ct. at 2086. This is due in large part to the fact that Congress has opted for a system of private broadcasters licensed and regulated by the government. By doing so, Congress has unmistakenly evinced its desire that these broadcasters, although federally regulated, maintain a substantial measure of journalistic independence. *Columbia Broadcasting, supra*, at 116, 93 S.Ct. at 2093.

■ As it has developed, this regulatory system has cast the broadcasters as "public trustees," charged with the obligation of fairly and impartially informing the public audience. And, while the FCC acts as overseer, "the initial and primary responsibility for fairness, balance and objectivity rests with the licensee." *Id.* at 117, 93 S.Ct. at 2094. Indeed, to perform in conformity with the First Amendment, the FCC "must oversee without censoring." *Id.* at 118, 93

S.Ct. at 2094. Likewise, the licensee may not transmit its views to the exclusion of those advocated by others.

Just as the FCC must move with caution, so too must the courts within the broadcasting arena. On the one hand, the courts must be alert to the unique nature of the broadcasting industry, which uses a limited and valuable public resource, to insure that it is being used in the public's interest. On the other hand, however, the courts must preserve the journalistic freedom and editorial prerogative Congress intended to abide in the licensees.

Given these general principles, I turn to the sensitive question of whether plaintiffs' First Amendment claims are sufficient to withstand the instant motion to dismiss.

The threshold issue is, assuming, as I must, the truth of plaintiffs' allegations, whether defendants' conduct was governmental or private in nature. To be sure, the cases are legion that the First Amendment's prohibition against restrictions upon speech and the press "is a restraint on governmental action, not that of private persons." *Columbia Broadcasting, supra*, at 114, 93 S.Ct. at 2092. *See also Jensen v. Farrell Lines, Inc.*, 625 F.2d 379 at 384 (2d Cir. 1980); *Kuczo v. Western Connecticut Broadcasting Co.*, 566 F.2d 384, 387 (2d Cir. 1977); *Kops v. New York Tele Co.*, 456 F.Supp. 1090, 1093 (S.D.N.Y.1978), *aff'd mem.*, 603 F.2d 213 (2d Cir. 1979).

In *Columbia Broadcasting, supra*, the Supreme Court was faced with a factual setting not terribly dissimilar from the instant action. Indeed, at issue was a broadcasters' refusal to sell advertising time for editorial purposes. The facts were as follows:

The Democratic National Committee ["DNC"] and the Business Executives' Move for Vietnam Peace ["BEM"], filed complaints with the FCC charging that the practice of broadcasters in refusing to sell time slots to individuals and groups wishing to expound their views on controversial issues,[2] violated the First Amendment as well

---

2. It was clear that most, but not all, broadcasters followed BEM's policy of refusing to sell

time for spot announcements to individuals and groups wishing to air their views on controver-

as the Communications Act of 1934, 47 U.S.C. §§ 151 et seq.

The FCC rejected these charges and held that so long as a broadcaster meets its obligation as a public trustee to provide full and fair coverage of public issues, it is not required to accept editorial advertisements. Democratic National Committee, 25 F.C. C.2d 216; Business Executives' Move for Vietnam Peace, 25 F.C.C.2d 242. In addition, the Commission rejected the charges lodged in the BEM complaint that these exclusionary policies violated the Fairness Doctrine which requires that a broadcaster must provide adequate coverage of issues of public importance which are calculated to fairly reflect differing views.

In overturning the FCC's decision, the D. C. Circuit held that broadcasters are instrumentalities of the federal government for First Amendment purposes and, as such, a flat ban on paid public issue announcements was violative of the First Amendment. Business Executives' Move for Vietnam Peace v. F. C. C., 450 F.2d 642, 646 (D.C.Cir. 1971). The Supreme Court reversed.

The thrust of the Court's decision, in which seven Justices concurred, was that the Communications Act, which incorporates First Amendment principles, did not require broadcasters to accept editorial advertisements. However, on the question of whether the broadcasters' conduct constituted governmental action the Court was less definitive. The Chief Justice, together with Justices Douglas, Stewart and Rehnquist, found that there was no governmental action. Three other Justices, White, Blackmun and Powell, declined to reach the question of governmental action.

Only the dissenters, Justices Brennan and Marshall, concluded that a broadcasters' conduct constituted governmental action. In reaching this conclusion, the dissenters focused on a number of elements. They included the public nature of the airwaves, the status of the licensees as public trustees, the pervasive federal regulation of the broadcasting industry and, most importantly, the FCC's approval of the challenged conduct.

Although it is evident that Columbia Broadcasting failed to resolve the nature of a broadcasters conduct vis–a–vis the First Amendment, numerous courts have since had an opportunity to address the issue. As recently noted in Kuczo v. Western Connecticut Broadcasting Co., 566 F.2d 384 (2d Cir. 1977), the prevailing view has been that broadcasters are not government instrumentalities and their conduct does not constitute governmental action. See, e. g., Kuczo, supra, at 387 and cases cited therein. In fact, in only two cases have courts reached a different conclusion. Business Executives' Move for Vietnam Peace v. F. C. C., 450 F.2d 642, 646 (D.C.Cir.1971), rev'd on other grounds, Columbia Broadcasting, supra; Writers Guild of America West, Inc. v. F. C. C., 423 F.Supp. 1064 (C.D.Cal.1976), vacated in 609 F.2d 355 (9th Cir. 1979), on the ground that primary jurisdiction to consider plaintiffs' challenges rest with the FCC. And, as will be pointed out below, in both cases there was compelling FCC conduct which is conspicuously absent from the case at bar.

As previously mentioned, in Business Executives' Move for Vietnam Peace v. F. C. C., the D. C. Circuit found that a broadcaster's conduct may, in fact, constitute governmental action. However, in Business Executives, the court's determination hinged primarily upon the fact that the FCC had expressly approved the very conduct which was alleged to be violative of the First Amendment. Thus, a federal regulatory agency condoned the very conduct of its

sial issues. In its complaint before the FCC, however, DNC claimed that since "it intended to purchase time from . . . the national networks in order to present the views of the Democratic Party and to solicit funds . . . [DNC would] encounter considerable difficulty–if not total frustration of its efforts–. . .

in the event the [FCC] should decline to issue a ruling as requested." 412 U.S. at 98–99, 93 S.Ct. at 2084–2085.

Thus, while DNC did not object to the policies of a particular broadcaster before the FCC, the argument was that absent FCC action, access to the broadcasters would be denied.

licensees which was alleged to be constitutionally infirm.

Likewise, in *Writers Guild of America, West, Inc. v. F. C. C., supra,* governmental action was found based upon FCC conduct. Here, however, the FCC did much more than simply approve of the challenged conduct of the broadcasters. To be sure, the FCC exerted significant pressure upon the broadcasters to adopt the "family hour" viewing policy. In light of this significant FCC pressure, and the broadcasters' subsequent compliance with the proposed viewing policy, sufficient governmental intrusion was found in the programming domain to constitute governmental action for First Amendment purposes. 423 F.Supp. at 1140–43.

■ Thus, it would appear that before governmental action will be found in the context of a broadcaster's conduct, it must be demonstrated that the FCC, as a government instrumentality, has either expressly approved or campaigned for the challenged conduct of the broadcaster. Absent such circumstances, no First Amendment claim will lie.

■ Applying this analysis to the case at bar, the plaintiffs' First Amendment claims must be dismissed for want of governmental action. The broadcasters' conduct which plaintiffs attack is their decision to produce all documentaries in–house, and offer only these documentaries to their own stations as well as to their affiliates. However, there is no allegation that the FCC has condoned this practice or has in any way pressed the broadcasters to adopt this policy. On the contrary, plaintiffs themselves admit that the FCC is aware of the plight of the independent documentary film producer and, far from approving of the challenged conduct, has at least indicated its dissatisfaction therewith. *See* FCC, *2nd Interim Report by the Office of Network Study, Television Network Program Procurement,* part II at 331–32 (1965). *See also* Neubauer, *The Networks' Policy Against Freelance Documentaries: A Proposal For Commission Action,* 30 Federal Communications Law Journal 117, 120–21 (1978); *F.C.C. Regulation of Broadcast News: First Amendment Perils of Conflicting Standards of Review,* 48 Fordham L.Rev. 1226 (1980).

Thus, even the most liberal reading of the amended complaint before me fails to yield a scintilla of FCC conduct which will support a finding of governmental action and for this reason, plaintiffs' First Amendment claims must be dismissed.[3] *Kuczo, supra,* at 388.

■ Having failed to demonstrate governmental action for First Amendment purposes, the question remains whether plaintiffs' § 1985 claim must also fall.

Plaintiffs allege that defendants' conduct constituted a violation of 42 U.S.C. § 1985(3) which provides:

(3) If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Mem-

---

**3.** Since plaintiffs seek damages·as well as injunctive relief an additional question is "whether a direct right of action for damages lies in the case of a First Amendment violation as it does in the case of a Fourth, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), or Fifth, *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), Amendment Violation." *Jensen v. Farrell Lines, Inc., supra,* 625 F.2d at 384 n.3. The question remains unresolved in this Circuit. *Id.*

ber of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

As I have indicated above, plaintiffs have made no effort to comply with the basic pleading requirements of the Federal Rules of Civil Procedure. Rather than separating each claim and providing a short and plain statement upon which it is based, plaintiffs have grouped their constitutional and antitrust claims. However, when properly sifted, it is evident that plaintiffs' § 1985 claim rests upon the very same factual underpinnings as their First Amendment claim. And, the legal theory upon which this claim rests is an alleged abridgement by defendants of plaintiffs' First Amendment rights by denying plaintiffs' access to defendants' national networks.

The threshold question is whether plaintiffs must still allege governmental action to state a valid claim under § 1985 for an alleged deprivation of First Amendment rights.

Defendants urge that although § 1985 does not itself require government action, when it is used as a vehicle to assert a First Amendment violation, in order to state a valid claim it is incumbent upon the pleader to allege government action.

Plaintiffs, however, urge that "unlike claims lying directly under the First Amendment, plaintiffs' § 1985(3) claims of First Amendment violations do not require a showing of [government] action." Plaintiffs' Memorandum, dated July 27, 1979, at 113 [hereinafter referred to as "Plaintiffs' Memorandum"]. Smug in their belief, plaintiffs boldly assert that they decline at

this juncture to respond to defendants' argument that defendants' activities do not constitute government action. *Id.* at fn.36. However, in light of my holding above, it is evident that plaintiffs' reluctance to address the question of government action is founded not on their judgment that such is an unnecessary element in a § 1985 claim, but rather in their fundamental inability to demonstrate even a hint of government action.

In any event, what plaintiffs would have me do is to excise the government action requirement from their First Amendment claims. Both logic and the clear weight of reasoned legal authority dictate that the requirement of government action not be carved out of a First Amendment claim solely because it is brought under § 1985.

It is now settled that § 1985 does not itself provide substantive constitutional rights, but rather provides a vehicle by which *existing* constitutional rights may be vindicated. *See Great American Federal Savings & Loan Ass'n v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). In short, the statute only provides a remedy. *Id. See also Weiss v. Willow Tree Civil Ass'n*, 467 F.Supp. 803, 815 (S.D.N.Y. 1979). However, there has been some disagreement with respect to the question of whether § 1985 ever requires government action in order to state a valid claim. *See, e. g., Spirit v. Teachers Insurance & Annuity Ass'n*, 475 F.Supp. 1298, 1314 & n.25 (S.D.N.Y.1979). The source of this confusion appears to be the Supreme Court's decision in *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

In *Griffin*, the Supreme Court held that a claim alleging a wholly private conspiracy of racial discrimination was actionable under § 1985(3). However, the constitutional predicate upon which plaintiffs' claim hinged was the Thirteenth Amendment which itself prohibited "conspiratorial, racially discriminatory private action." 403 U.S. at 105, 91 S.Ct. at 1799.

Thereafter, in *Great American*, the court held that § 1985(3) was purely a remedial statute and itself created no substantive

rights. Thus, when the two cases are read together, the clear import is that when the constitutional predicate, upon which a § 1985(3) claim hinges, permits a purely private conspiracy to be redressed—as with the Thirteenth Amendment, then § 1985, as a purely remedial statute, does not require that government action be alleged. Where, however, the constitutional predicate itself requires government action, as with the First and Fourteenth Amendments, then governmental action becomes an essential element of a § 1985(3) claim premised thereon. Indeed, "the requirement of state action, in this context, is no more than a requirement that there be a constitutional violation." *Great American, supra*, 99 S.Ct. at 2355 (Stevens, J., concurring).

Plaintiffs vigorously argue that since *Griffin* focused only upon a constitutional predicate which did not require government action, the question with respect to those predicates requiring government action remains open. I disagree.

In addition to the clear import of *Griffin* and *Great American*, the majority of cases which have addressed the problem have concluded that where the constitutional predicate upon which a § 1985(3) claim is premised requires government action, then government action becomes a necessary element of the § 1985 claim. *See Murphy v. Mount Carmel High School*, 543 F.2d 1189, 1193–94 (7th Cir. 1976); *Spirit v. Teachers Insurance & Annuity Ass'n*, 475 F.Supp. 1298, 1313–14 (S.D.N.Y.1979); *Gemini Enterprises, Inc. v. WFMY Television Corp.*, 470 F.Supp. 559, 567 (M.D.N.C.1979); *Bianco v. American Broadcasting Co.*, 470 F.Supp. 182, 184 (N.D.Ill.1979).

Accordingly, based upon plaintiffs' fundamental inability to allege the requisite government action, plaintiffs' § 1985(3) claims suffer from the same fatal defect as their First Amendment claims and for this reason must be dismissed.

Before moving from plaintiffs' First Amendment claims, I must note a deep-seated conviction that any complaints which plaintiffs may have are based squarely on economic grounds and are cloaked in the language of "free speech" merely as an alternative cause of action permitted by the liberal rules of pleading. I find it difficult to believe that plaintiffs, in the exercise of their alleged First Amendment rights or civil rights, would give completed programs to the defendants to be aired on the national systems without the expectation of, nay the demand for, payment.

*Defendants' First Amendment Defense*

■ I turn now to consider the First Amendment defense invoked by the defendants. Although this defense has been asserted only insofar as plaintiffs' antitrust claims are concerned, I will consider it at this juncture since, as defendants urge, if the defense is found to have merit, it will effect the standard against which the sufficiency of plaintiffs' claims are to be tested. In particular, defendants urge that when fundamental constitutional rights are involved, alleged antitrust claims must be pleaded with a greater degree of specificity. Defendants conclude that plaintiffs' claims fall woefully short of the requisite specificity and must be dismissed. Of course, in the alternative, defendants contend that even under the normal pleading requirements, plaintiffs' allegations fail to state a claim upon which relief can be granted.

The essence of defendants' First Amendment defense is that plaintiffs' antitrust allegations seek to compel this court to do that which is prohibited under the First Amendment, to wit: to direct that defendants consider the purchase of news and documentary programs produced by independents for airing by defendants' own stations as well as by their affiliates. Defendants reason that "in light of the serious First Amendment concerns raised by the present challenge to defendants' journalistic policy, the Constitution requires a showing that it is anticompetitive economic motive which lies behind the challenged policy—not the exercise of protected editorial judgment." Defendants' Reply Memoranda at 33. They conclude that "[s]uch economic and anti-competitive motivation must be pleaded and proven to bring the claim within the reach of the antitrust laws." *Id.* at 33–34.

■ Although not expressly urging that their conduct be excluded from the parameter of the antitrust laws, defendants do seek to impose a more rigid standard of pleading upon plaintiffs than is generally required in a federal civil action. In this regard, they rely heavily upon *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and its progeny, to establish that the antitrust laws seek only to prohibit certain economic activity which has been perceived, correctly or incorrectly, as anti–competitive. It was not the intent of Congress that political and other First Amendment protected conduct be within the scope of the antitrust laws. *Noerr, supra*, at 138, 81 S.Ct. at 530. *See also Missouri v. National Organization of Women, Inc.*, 620 F.2d 1301 (8th Cir. 1980).

There can be no doubt that certain First Amendment protected conduct is shielded from the antitrust laws. However, those cases relied upon by defendants have sought to exclude the conduct in issue from scrutiny under the antitrust laws.

In *Noerr, supra*, a group of trucking companies and their trade association commenced an action against a group of railroads, a railroad association and a public relations firm, charging that the defendants engaged in a publicity campaign against the truckers "designed to foster the adoption and retention of laws and law enforcement practices destructive of the trucking business." 365 U.S. at 129, 81 S.Ct. at 525. Plaintiffs concluded that such conduct was in restraint of trade and, as such, violative of the antitrust laws. The Supreme Court disagreed finding that where a genuine effort is made to influence legislation and law enforcement practices, the antitrust laws are inapplicable.

The *Noerr* doctrine was recently reaffirmed in *Missouri v. National Organization for Women, Inc.*, 620 F.2d 1301 (8th Cir. 1980), [hereinafter referred to as "NOW"]. In *NOW*, the National Organization for Women organized a convention boycott against all states that had not ratified the proposed Equal Rights Amendment. The

economic impact of such a boycott is apparent. Indeed, Missouri motels and restaurants, the beneficiaries of the convention traffic, as well as the state lost revenues as a result of the boycott. The state sought to preclude the boycott as an impermissible conspiracy in restraint of trade.

The court, finding that the National Organization for Women was politically motivated to use the boycott to influence ratification of the Equal Rights Amendment, held that the antitrust laws did not reach the Organization's boycott activities.

It is crucial to note that in both *Noerr* and *NOW*, the question was whether the activity that was challenged as violative of the antitrust laws was excluded from the reach of the antitrust laws. In the instant case, however, quite a different situation obtains. Defendants do not seek to exclude the challenged conduct from scrutiny under the antitrust laws. Rather, defendants seek to impose a higher standard of pleading upon plaintiffs, to insure that plaintiffs seek to challenge economic conduct and not protected First Amendment conduct. It is plaintiffs' failure to meet this higher standard of pleading which forms the basis of defendants' First Amendment defense and their motion to dismiss in connection therewith.

■ Furthermore, in both *Noerr* and *NOW*, the challenged conduct was calculated principally to affect and influence legislation and was not an attempt to interfere with business relationships in a manner proscribed by the antitrust laws. However, the conduct challenged herein is not so easily characterized. It is editorial as well as economic in nature. To be sure, the decision to air only in–house news and documentary productions is the very essence of a broadcaster's editorial prerogative. However, a decision to air only in–house productions could arguably be construed as an impermissible boycott and an attempt to interfere with business relationships in a manner proscribed by the antitrust laws.

Suffice it to say that, at least at this juncture, the challenged conduct has not been shown to be so purely editorial in

nature as to exclude it from the reach of the antitrust laws. And, absent such purely editorial conduct, plaintiffs' claims must be tested against the normal pleading requirements applicable in federal court.

Additionally, defendants' attempts to impose a more stringent pleading requirement upon plaintiffs because of the possible "chilling effect" of the instant claims are to no avail. This is not to suggest, however, that the potential chill of First Amendment rights will never require a higher standard of pleading. On the contrary, there is a certain amount of precedent to the effect that when challenged conduct is arguably protected under the First Amendment, the danger of chilling requires more specific allegations. *See, e. g., Franchise Realty v. San Francisco Local Joint Executive Board,* 542 F.2d 1076, 1082–83 (9th Cir. 1976), *cert. denied,* 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977); *Bethlehem Plaza v. Campbell,* 403 F.Supp. 966 (E.D.Pa.1975). However, these cases are clearly distinguishable from the case at bar. Indeed, the essence of these decisions was the likelihood that the claims urged by plaintiffs would chill the otherwise unfettered exercise of defendants' First Amendment rights. Here, however, it is clearly unlikely that any such chilling effect will occur. The challenged conduct, defendants' steadfast refusal to purchase news and documentary programs produced by independents, is not likely to change. To be sure, defendants have not indicated that they intend to alter their policy. Moreover, although broadcasters are not without First Amendment protection, given the FCC's regulatory function and the nature of the broadcast industry, normal First Amendment treatment is not controlling. *Red Lion, supra,* 395 U.S. at 388–89, 89 S.Ct. at 1805–06.

Thus, absent the likelihood of a chilling effect upon defendants' protected conduct, the normal pleading requirements will control.

▪ This, of course, should not be construed as an indication that defendants' First Amendment defense is not a viable one. On the contrary, given the papers before me, the defense appears to be a particularly appropriate one. There can be no doubt that the conduct challenged by plaintiffs involves, in large part, the journalistic freedom of defendants as well as the defendants' ability to vindicate their obligations to the public as public trustees. As previously mentioned, this requires a delicate balance of the Constitutional interests involved. And, although insufficient to impose a greater procedural burden upon plaintiffs at the pleading stage, this delicate balance may very well impose a greater burden upon plaintiffs in the disposition of this action.

## Plaintiffs' Antitrust Claims

Plaintiffs have charged that defendants' practices with respect to the production of news and documentary programs constitute various violations of the antitrust laws. In particular, plaintiffs charge:

(a) under § 2 of the Sherman Act, 15 U.S.C. § 2, that each network defendant, by virtue of its policy of the in–house production of documentary programs, have monopolized, or attempted to monopolize, the relevant documentary market;

(b) under § 1 of the Sherman Act, 15 U.S.C. § 1, that the network defendants have combined and contracted among themselves and with their own stations and/or affiliate stations to refuse to purchase independently produced news and documentary programs;

(c) under § 3 of the Clayton Act, 15 U.S.C. § 14, that each of the network defendants improperly conditioned the sale of its news and documentary programs to its affiliates upon the agreement or understanding that the affiliates would not purchase or deal in the news and documentary programs produced by competitors; and

(d) under §§ 1 and 2 of the Sherman Act and § 3 of the Clayton Act, that defendants each engaged in an impermissible tying arrangement in the sale of news stories to its affiliates.

*§ 2 Monopolization:*

■ In order to state a valid claim under § 2, a plaintiff is required to allege that the defendant enjoys monopoly power in the relevant market and has wilfully acquired or maintains this power rather than enjoying it solely as a result of growth, development, a superior product, business acumen or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966).

■ Thus, the threshold requirement is that defendants possess "monopoly power" in the relevant market. This necessarily compels plaintiffs to define, in their complaint, the parameters of the relevant market. Indeed, illegal monopoly power may only be appraised in terms of the competitive market for the product. *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956). *See also Nifty Foods Corp. v. Great Atlantic & Pac. Tea Co.*, 614 F.2d 832, 840 (2d Cir. 1980); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

■ In addition, assuming monopoly power in the relevant market has been established, plaintiffs must also demonstrate the wilful acquisition or maintenance of this power. Since monopoly power is " 'the power to control prices or exclude competition,' " *Grinnell, supra*, 384 U.S. at 571, 86 S.Ct. at 1704, this requires that plaintiffs demonstrate that the monopoly power was acquired to further these anti–competitive ends.

In *du Pont, supra*, the court, in defining the relevant market, observed that "[i]n considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purpose make up that 'part of the trade or commerce,' monopolization of which may be illegal." 351 U.S. at 395, 76 S.Ct. at 1007. That is to say "[d]etermination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another." *Id.* at 393, 76 S.Ct. at 1006. Thus, only when a manufacturer's product is so unique or so dominant in the market will this single product define the relevant market. *See, e. g., ALW, Inc. v. United Airlines, Inc.*, 510 F.2d 52, 56 (9th Cir. 1975).

Although these principles are relatively simple in the abstract, applying them to the case at bar is somewhat more difficult. As is obvious from all that has previously been said, the television industry is indeed unique in many ways. For example, the courts have long recognized that the industry is subject to an inherent physical limitation. Indeed, "[b]roadcast frequencies are a scarce resource; they must be portioned out among applicants. All who possess the financial resources and the desire to communicate by television . . . cannot be satisfactorily accommodated." *Columbia Broadcasting, supra*, 412 U.S. at 101, 93 S.Ct. at 2086.

It follows that since the number of broadcast participants is naturally limited by the available frequencies, competition is also necessarily limited. However, in exchange for the use of this limited resource, and the concomitant reduction in competition, the broadcaster is cast as a trustee–and the general viewing public as the beneficiaries thereof. 412 U.S. at 102, 93 S.Ct. at 2086. Thus, "a [broadcaster] must balance what it might prefer to do as a private entrepreneur with what it is required to do as a 'public trustee.' " 412 U.S. at 118, 93 S.Ct. at 2094. Underlying its responsibility as a public trustee is " 'the right of the public to be informed, rather than any right on the part of the Government, any broadcast licensee or any individual member of the public to broadcast his own particular views on any matter.' " *Id.* at 112–13, 93 S.Ct. at 2091.

Additionally, the transmission of news and documentary programs does not involve a tangible commodity. To be sure, with respect to the national network defendants,

the television industry operates in such a way as to defy traditional § 2 analysis. Each of the network defendants provides a schedule of news and documentary programs which they transmit to their affiliates for broadcast. The defendants, of course, sell advertising time for these programs which are offered to the affiliates. When an affiliate chooses to broadcast a program transmitted by the network defendants, an advertiser pays a premium for the opportunity of reaching a national market. In addition, when an affiliate does broadcast a network program, the network would in turn pay the affiliate for broadcasting the network's advertising message.

Only if these realities of the television industry are acknowledged is the question of the relevant product market properly focused.

Defendants attack plaintiffs' § 2 claims on dual grounds. First, they urge that the claims are fatally defective in that they fail to allege an appropriate relevant market. In addition, defendants charge that even assuming the truth of plaintiffs' allegations, defendants' conduct does not, as a matter of law, constitute unlawful monopolization.

Plaintiffs, in their amended complaint, charge that each of the network defendants have monopolized the news and documentary programs exhibited on their networks. For example, with respect to NBC, the complaint charges that:

> defendant NBC has engaged in a combination and conspiracy with its owned and operated television stations (including defendant WNBC–TV), the NBC affiliates and others to monopolize, has attempted to monopolize and has monopolized the trade and commerce in television public affairs and news programs exhibited on the NBC Television Network, in violation of Section 2 of the Sherman Act.

Thus, what plaintiffs are alleging is that NBC news and documentary programs comprise the total relevant product market. Likewise, with respect to ABC and CBS, the § 2 claim parrots that quoted above. It charges both ABC and CBS, respectively, with monopolizing the market for their own news and documentary programs.

In urging such a limited product market, plaintiffs contend that the affiliate stations of the network defendants must be viewed as the ultimate purchaser of the news and documentary programs in issue. And, as the ultimate purchasers, plaintiffs argue that the national network of affiliates for each of the network defendants is the appropriate product market. They reason that the news and documentary programs produced by NBC, for example, which are offered to its affiliates, are not interchangeable with those programs offered by ABC or CBS. Each NBC purchaser–affiliate station is, as a practical matter, limited to those news and documentary programs produced and offered by NBC to its affiliate stations. Thus, plaintiffs conclude that the limited product market is certainly justified by the realities of the television industry.

It does not require a protracted legal analysis to conclude that if such a relevant product market is adopted, each of the network defendants certainly possess monopoly power. Indeed, since each network naturally controls 100 percent of its own product market, the only issue for determination would be the circumstances surrounding the acquisition or maintenance of this monopoly power.

Defendants, of course, advance quite a different view of the relevant product market. Indeed, they urge that in the area of news and documentary programs, the three network defendants are engaged in fierce competition for the national viewing public. They conclude that it is this national viewing public which must be cast as the ultimate purchaser whose perspective of reasonably interchangeable products must control.

It is clear that the essence of establishing the relevant product market is the identification of the ultimate purchaser of the commodities in issue. It is from this perspective that the availability of interchangeable commodities is explored and, in turn, the

presence or absence of monopoly power is determined.

■ The parties have advanced two perspectives from which the product market is to be defined. The plaintiffs urge that the proper perspective is that of the network affiliates. The defendants counter that it is the perspective of the national viewing audience which must define the relevant product market. There is, however, a third perspective from which the relevant product market may be defined. That is, from the perspective of the plaintiffs–the independent producers–directors, whose documentary programs are the subject of the instant suit. Under close scrutiny, however, regardless of which perspective is adopted, the inexorable conclusion is that plaintiffs have failed to allege any product market in which the defendants have exercised monopoly power or were ever capable of doing so. Accordingly, plaintiffs' § 2 claim must be dismissed. *Nifty Foods Corp., supra,* 614 F.2d at 840–41.

It is evident that given the economic realities of the television industry, the only possible relevant market is one in which the national viewing public is cast as the ultimate consumer. It is from this perspective that the presence or absence of interchangeable commodities must be determined. Indeed, despite the natural physical limitations in the television industry, "it is the right of the public to receive suitable access to social, political, esthetic, moral . . . ideas and experiences which is crucial here," *Columbia Broadcasting, supra,* 412 U.S. at 102, 93 S.Ct. at 2086, and not the right of independent producer–directors to have their particular documentary programs purchased by the network defendants.

It follows, therefore, that the essence of a network's obligation as a public trustee is to the public, and it is the public's ability to view documentary programs which must control.

Plaintiffs concede, as they must, that when viewed from the eyes of the national viewing audience, the news and documentary programs presented by the three network defendants are "interchangeable commodities." Indeed, all a viewer need do is tune to the documentary program of his choice. Moreover, plaintiffs do not contend for one moment that any of the defendants possess monopoly power in the news and documentary market. *See* Plaintiffs' Memorandum in Opposition at 46 n.8. Thus, when plaintiffs' claims of monopolization are tested against the proper relevant product market, they fall woefully short of stating a claim upon which relief may be granted.

■ In addition, the alleged percentages of the relevant market attributed to the network defendants, each possessing at most 33 percent of the relevant market, is, as a matter of law, insufficient to support a claim of monopolization and warrant that judgment be entered for defendants. *United States v. Aluminum Co. of America,* 148 F.2d 416, 424 (2d Cir. 1945). *See also Nifty Foods Corp., supra,* 614 F.2d at 840–41.

■ Moreover, assuming, *arguendo,* that plaintiffs' definition of the relevant product market was appropriate, the undisputed facts belie the presence of monopoly power therein. The affiliation agreements employed by the network defendants, although not uniform, do not require that the affiliate stations purchase any of the news and documentary programs produced and transmitted by the network defendants. On the contrary, the affiliates are free to reject these programs and air either locally produced news and documentary presentations (Plaintiffs' Memorandum in Opposition at 4) or purchase the documentary programs produced by plaintiffs herein. Nor is there a contractual provision in any of the affiliate agreements in issue which would preclude an affiliate station from seeking news and documentary programing from a network defendant other than that with which it is affiliated.[4]

In fact, any of the contractual arrangements outlined above are expressly prohib-

4. The NBC affiliation agreement provides in pertinent part:

With respect to programs offered or already contracted for pursuant to this affiliation

ited by several FCC regulations. See 47 C.F.R. § 73.658(a), (d) & (e).[5]

There is simply no contractual impediment, express or implied, placed upon any of the affiliates with respect to seeking news and documentary programs. They are free to seek such programing other than that offered by the network defendant with whom they are affiliated. In short, the affiliates had a real choice of news and documentary programs despite the affiliation agreements. *Cf., Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 24, 99 S.Ct. 1551, 1564, 60 L.Ed.2d 1 (1979).

> contract, nothing herein contained shall prevent or hinder:
> (a) The Station from:
> (i) rejecting or refusing network programs which the Station reasonably believes to be unsatisfactory or unsuitable or contrary to the public interest, or
> (ii) substituting a program which, in the Station's opinion, is of·greater local or national importance.
> ¶ 4 of the NBC Affiliation Agreement. The affiliation agreements of ABC and CBS contain similar provisions. Additionally, the affiliation agreements expressly authorize the network defendants to offer their programs to other stations including those in the affiliates broadcasting range. The affiliation agreement merely gives the affiliate the right of first refusal with respect to a given program.

**5.** These sections provide:
> § 73.658 Affiliation agreements and network program practices; territorial exclusivity in non–network program arrangements.
> (a) Exclusive affiliation of station. No license shall be granted to a television broadcast station having any contract, arrangement, or understanding, express or implied, with a network organization under which the station is prevented or hindered from, or penalized for, broadcasting the programs of any other network organization. (The term "network organization" as used in this section includes national and regional network organizations.
>
> .    .    .    .    .
>
> (d) Station commitment of broadcast time. No license shall be granted to a television broadcast station having any contract, arrangement, or understanding, express or implied, with any network organization, which provides for optioning of the stations' time to the network organization, or which has the same restraining effect as time optioning. As used in this section, time optioning is any

Furthermore, the limited duration of the affiliation agreements belies the non–interchangeability of documentary programs transmitted by the network defendants upon which plaintiffs so heavily rely. For example, the standard affiliation agreement executed by the network defendants and their affiliates provide that the maximum duration of an affiliation agreement is two years.[6] And, in fact, at least one of the standard affiliation agreements in issue provides for termination of the agreement, by either the network or the affiliate, before the expiration of the term on three months' notice.[7]

> contract, arrangement, or understanding, express or implied, between a station and a network organization which prevents or hinders the station from scheduling programs before the network agrees to utilize the time during which such programs are scheduled, or which requires the station to clear time already scheduled when the network organization seeks to utilize the time.
> (e) Right to reject programs. No license shall be granted to a television broadcast station having any contract, arrangement, or understanding, express or implied, with a network organization which, with respect to programs offered or already contracted for pursuant to an affiliation contract, prevents or hinders the station from (1) rejecting or refusing network programs which the station reasonably believes to be unsatisfactory or unsuitable or contrary to the public interest, or (2) substituting a program which, in the station's opinion, is of greater local or national importance.

**6.** This too is a function of an FCC regulation which provides:
> (c) Term of affiliation. No license shall be granted to a television broadcast station having any contract, arrangement, or understanding, express or implied, with a network organization which provides, by original terms, provisions for renewal, or otherwise for the affiliation of the station with the network organization for a period longer than 2 years: Provided, That a contract, arrangement, or understanding for a period up to 2 years may be entered into within 6 months prior to the commencement of such period. 47 C.F.R. § 73.658(c).

**7.** ·The ABC affiliation agreement provides that "It is understood and agreed, however, that this agreement may be terminated by either party upon giving the other party three (3) months

Accordingly, even accepting the limited sub–market urged by the plaintiffs, affiliate stations are undeniably free to seek news and documentary programs not only from any of the other network defendants, but also from the independents. The simple fact is that the affiliates are free to seek news and documentary programs from any and all of these sources and the programs must be viewed as interchangeable in attempting to establish monopoly power. Similarly, affiliates are free to terminate their affiliation with any of the network defendants at least every two years. This gives the affiliates a high degree of mobility. Periodically they have the option of either switching affiliations or rejecting all the network defendants and remaining a local broadcaster; options which are not infrequently exercised.[8]

Thus, given the number of alternative sources for the programs in issue, it cannot be said that any of the network defendants has such a percentage of the market to be able to either control prices or exclude competition.[9] To be sure, the network defendants, as well as the local affiliated and unaffiliated stations, are fiercely competitive with each other. This is especially true in the area of news productions. Wall St. Journal, April 11, 1980, at 1, col. 4 ("In this business [of news gathering], if a couple of stations do something new and it works, then everybody joins in. Everybody is looking for the latest competitive weapon").

Finally, if the plaintiffs' perspective is adopted in order to define the presence or absence of alternative outlets for their product, it is evident that despite the network defendants' refusal to purchase plaintiffs' programs, plaintiffs themselves view the three network defendants as interchangeable purchasers of their programs. Indeed, nowhere have the plaintiffs indicated that one network's programming is somehow different from the others. In short, the plaintiffs themselves view the news and documentary programs produced by the network defendants as essentially fungible. They also view the networks as potentially interchangeable purchasers of news and documentary programs produced by the independents.

Thus, from whatever perspective one chooses to view the network defendants, it is abundantly clear that insofar as their news and documentary programs are concerned, the network defendants, as well as their in–house productions, must be viewed as interchangeable commodities in defining the relevant product market and determining any one defendant's share thereof. It follows that given the high degree and ease of interchangeability, the mobility of the affiliate stations, as well as the nature of the television industry, no one network is capable of dominating the relevant market.

In attempting to establish three sub–markets consisting of the news and docu-

advance written notice of its intention so to do."
The CBS affiliation agreement requires 12 months notice of an intention to terminate the agreement.

8. *See, e. g.*, N.Y.Times, July 31, 1979, C 15, Col. 3; Wall St. Journal, June 19, 1979, at 38, Col. 4; Wall St. Journal, May 4, 1979 at 10, Col. 2; Washington Post, March 30, 1979, at B10; Newsday, September 9, 1978, at 34A.

9. Recently, in an article entitled "Video Methods Reshaping Film Industry: TV Technology Erodes Control of Distribution" it was noted that "[a]s audiences for pay television and the home video recording devices grow . . . it will become increasingly attractive economically to develop movies and other programming for these services. Thus, . . . independent producers will no longer be limited to selling their ideas to the traditional studios and

networks." N.Y.Times, July 17, 1980, at D 6, Col. 4. *Separately, a recent ruling by the FCC has lifted two major restraints upon the Cable television industry which will undoubtedly increase cable television as a competitive factor in the industry.* Wall St. Journal, July 23, 1980, at 46, Col. 4. It has been estimated that Cable TV systems service about 21 percent of those U.S. households with television sets. *See Id.* However, the recent explosion of the pay TV, Cable TV and video, and their competitive effect upon the television industry, have been totally ignored by plaintiffs in their blind quest to establish the narrowest of possible product markets. In short, just as competition in the television industry is reaching new heights, plaintiffs choose, by ignoring these new competitive forces, to view the industry in the most restrictive fashion possible.

mentary programs of each of the network defendants, plaintiffs rely heavily upon the decision of Judge Kelleher in *United States v. CBS, Inc.*, 459 F.Supp. 832 (C.D.Calif. 1978). It is true that Judge Kelleher recognized the existence of sub–markets in the television industry. The two sub–markets in issue consisted of the prime–time television network entertainment programs purchased by CBS and ABC. However, this case is clearly distinguishable from the case at bar.

Indeed, in *United States v. CBS*, the court noted that "CBS television entertainment programs [were] not reasonably interchangeable with programs considered by ABC and NBC because CBS insulates itself from competition from the other two national . . . networks by imposing an elaborate structure of contractual restraints on independent television program producers and others." 459 F.Supp. at 839. It was because of these contractual restraints that a separate and distinct sub–market was found to be sufficiently alleged.

As is evident from the discussion above, these contractual restraints were absent with respect to the transmission of news and documentary programs. The affiliates were free to purchase news and documentary programs from independent producers as well as from any one of the network defendants.

■ Plaintiffs' claim of attempted monopolization must also fall. The essential elements of attempted monopolization under § 2 of the Sherman Act are (1) a dangerous probability of success in monopolizing a given product market and (2) a specific intent to destroy competition or control prices in this market. *Nifty Foods Corp., supra*, 614 F.2d at 841. In light of the limited share of the market possessed by each of the network defendants, plaintiffs have failed to establish, as a matter of law, that there was a dangerous probability that any of the defendants would succeed in monopolizing the relevant market. *See United States v. Empire Gas Corp.*, 537 F.2d 296, 305–07 (8th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572

(1977) (proof of 50 percent market share alone is not sufficient to show a dangerous probability of success).

■ It is evident that plaintiffs can prove no relevant product market in which any of the network defendant's share exceeds 33 percent. Thus, plaintiffs have failed to evidence that any of the defendants had even a probability, much less a dangerous probability, of monopolizing the market based upon its market share and the fierce competition which obtains in the market.

■ Likewise, plaintiffs' attempts to charge a conspiracy to monopolize are also fatally defective. In plaintiffs' efforts to limit the relevant product market to the in–house productions of each of the network defendants, the only conspiracy alleged, albeit ever–so conclusory, is one of vertical integration. And, while vertical integration alone will not support a charge of monopolization, *United States v. Columbia Steel Co.*, 334 U.S. 495, 525, 68 S.Ct. 1107, 1123, 92 L.Ed. 1533 (1948), again the absence of a sufficient share of the relevant market precludes such a claim.

■ In addition, plaintiffs' charges of attempted monopolization and conspiracy to monopolize are defective for another reason. Plaintiffs have simply, in boilerplate fashion, charged the defendants with attempting and conspiring to monopolize. However, plaintiffs have failed to even allege the essential elements of each of these violations. For example, nowhere in plaintiffs' amended complaint are the defendants charged with specifically intending to monopolize the market. Nor are they charged with possessing sufficient market share to create a dangerous probability that they would be successful. To be sure, the words "intent" and "dangerous probability of success" are conspicuously absent from plaintiffs' complaint although other essential elements of the antitrust violations alleged.

Moreover, even beyond the absence of these essential elements, plaintiffs have totally failed to indicate, even in conclusory

language, how the defendants' conduct somehow satisfied these essential requirements. This is true despite the fact that plaintiffs have already amended their complaint. The inevitable conclusion is that plaintiffs can do no more than allege, in boilerplate fashion, the charges of attempting and conspiring to monopolize.

Thus, for this reason also these charges must be dismissed.

▮ Plaintiffs also charge that defendants imposed an impermissible tying arrangement upon their affiliates in violation of sections 1 and 2 of the Sherman Act as well as § 3 of the Clayton Act, 15 U.S.C. § 14. More particularly, plaintiffs argue that defendants have tied the purchase by their affiliates of daily news reports which are not used by the network defendants on their respective nightly news programs, to those news reports which are used on these programs. In short, unless the affiliate agrees to purchase those news reports not actually broadcast by the network defendants, it is unable to broadcast those reports which are used by the networks. Plaintiffs reason that by virtue of this "tying arrangement" defendants have unreasonably restrained trade in that it

> unreasonably [restricts] plaintiffs' ability to develop economically viable independent video news services and to sell video news segments to affiliate news departments.

See Amended Complaint ¶¶ 71, 76 and 81.

Initially, defendants urge that plaintiffs lack standing to challenge the alleged tying arrangement. Indeed, they reason that before a plaintiff is entitled to monetary relief for an alleged tying arrangement, he must show that he has somehow been damaged by the arrangement. 15 U.S.C. § 15. Likewise, before a plaintiff is entitled to enjoin the arrangement, he must demonstrate that he is threatened with loss or damage if the arrangement is permitted to continue. 15 U.S.C. § 26.

Defendants conclude that since plaintiffs have totally failed to allege that they are in any business which is injured by virtue of the alleged arrangement, or is in any way

threatened with damage or loss thereby, plaintiffs' tying claims are fatally defective.

In determining whether a party has standing to sue for treble damage under § 4 of the Clayton Act this Circuit has held that at the very least:

> a person must be within the "target area" of the alleged anti–trust conspiracy, i. e., a person against whom the conspiracy was aimed, *such as a competitor of the persons sued.* Accordingly, we have drawn a line excluding those who have suffered economic damage by virtue of their relationships with "targets" or with participants in an alleged anti–trust conspiracy, rather than by being "targets" themselves.

*Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292, 1295 (2d Cir. 1971) *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972) (emphasis added). *See also Schwimmer v. Sony Corporation of America,* No. 79–7665, slip. op. at 4266 (2d Cir. July 10, 1980). Likewise, to obtain injunctive relief the plaintiff must demonstrate that "he is threatened with loss or damage ' . . . of a sort personal to the plaintiff.'" *National Auto Brokers Corp. v. General Motors Corp.,* 60 F.R.D. 476, 492 (S.D.N.Y.1973), *quoting United States v. Borden Co.,* 347 U.S. 514, 518, 74 S.Ct. 703, 706, 98 L.Ed. 903 (1954). That is to say, the complaint must allege "a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." 13 Von Kalinowski, Antitrust Laws and Trade Regulation § 99.04 at 99–15 (1979). *See also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130–31, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969). And, although these standing requirements are quite broad, the "courts have recognized the need to limit the scope of Section 4 by establishing 'practical rules of standing . . . [to] exclude remote parties with possibly speculative injuries.'" *Schwimmer v. Sony Corp., supra,* slip op. at 4265, *quoting Long Island Lighting Co. v. Standard Oil Co. of California,* 521 F.2d 1269,

1273 (2d Cir. 1975), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976).

In their amended complaint, plaintiffs have uniformly identified themselves as "independent writers, producers and directors of films, including documentaries and other films dealing with public affairs." Further, they identify their work as "public affairs documentary films" [10] which, because of the charges alleged in the complaint, have not been aired by the network defendants or their affiliates.

Despite plaintiffs' protestations to the contrary, Plaintiffs' Memorandum at 88, it is evident from the amended complaint that plaintiffs do not compete with defendants in the market of syndicated news services. Plaintiffs hopelessly confuse and equate their documentary–type productions with the "hard news" or daily syndicated news services which are the subject of the alleged tying arrangement. To be sure, there can be little doubt that the public affairs and documentary productions of plaintiffs constitute a completely independent line of commerce. Their productions neither compete with nor are interchangeable for the syndicated news services offered by the network defendants to their affiliates.

Moreover, plaintiffs do not contend that defendants' documentary productions, which are the subject of plaintiffs' Sherman Act claims, were somehow tied to the purchase, by the affiliates, of the hard news segments or syndicated news services at

issue. In fact, plaintiffs admit that the purchase of news segments and syndicated news services is governed by an agreement other than the affiliation agreement. Thus, even plaintiffs must recognize that any attempt to equate or even link their documentary productions with the syndicated news services sold by the network defendants to their affiliates is fundamentally unsound.

Insofar as plaintiffs' quest for treble damages is concerned, since plaintiffs' productions constitute a line of commerce independent from the news services which are the subject of the alleged tying arrangement, no damage will result to plaintiffs' business. Accordingly, plaintiffs are not within the target area of the alleged tying arrangement and do not have standing to challenge it. *Muttontown Pictures, Inc. v. Avco–Embassy Pictures Corp.*, 1976–1 Trade Cas. ¶ 60,918 (S.D.N.Y.1976); *Amerace Corp. v. U. S. M. Corp.*, 1971–1 Trade Cas. ¶ 60,255 (N.D.Ill.1975).

Unsecure in casting themselves as defendants competitors, plaintiffs alternatively urge that even if found not to be competitors in the market of syndicated news services, this does not effect their entitlement to equitable relief from the alleged tying arrangement. They urge that standing to seek injunctive relief under the Clayton Act requires only the threat of damage or loss. They conclude that since the alleged tying arrangement constitutes a barrier to their entry into the news syndication market, this is a sufficient threat of

---

**10.** The plaintiffs have in their complaint defined "public affairs programs" as

'Public affairs programs' means non–fictional informational programs shown on television primarily concerning local, national and international events, occurrences, trends, styles and political, economic or social issues. It includes talks, commentaries, discussions, speeches, editorials, political programs, documentaries, forums, panels, round–tables and similar programs. It does not include programs dealing exclusively with science, wildlife or nature.

Although somewhat illusory, it is evident from the definition that plaintiffs' handiwork was not in the field of hard news reporting. Rather, plaintiffs dealt with a more stylized brand of reporting tending toward the editorial or commentary aspects of news. I will, for want of a better term, characterize this reporting as soft news. That is, beyond the mere presentation of facts and events.

Plaintiffs have, in their memoranda in opposition to the instant motions, attempted to characterize their business as the production of "public affairs and news programming." Plaintiffs' Memorandum at 85. They further contend that short documentaries are nothing more than news segments, and news segments are nothing more than short documentaries. However, a quick review of the productions submitted by plaintiffs as representative of their work belies such strained logic. News and documentaries are two distinct productions despite plaintiffs' contortions to merge the two.

loss to permit their injunctive attack. I disagree.

There is no question that with respect to injunctive relief, a more liberal test of standing obtains. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969). The plaintiff must demonstrate only a significant threat of injury rather than injury in fact. But the threat of injury is not a meaningless requirement as plaintiffs would have me find. Rather, where the challenge is that an alleged tying arrangement constitutes a barrier for a plaintiff to enter a given market, the plaintiff must, at the very least, allege that he is realistically waiting in the wings. That is to say, there must exist some reasonable basis to believe that but for the tying arrangement, the challenger would rush from the wings and enter the market. *See Fincher v. American Airlines, Inc.*, 1979–1 Trade Cas. ¶ 62,590 (S.D.N.Y.1979).

Indeed, absent such realistic criteria of entry, any plaintiff could argue that he is a potential entrant into the market in issue and thus have standing to challenge the business practices of others. Such standing *per se* would, in no uncertain terms, render meaningless the "threatened damage or loss" contemplated by Congress in permitting private injunctive suits. Thus, in order to give meaning to the standard imposed by Congress, it is incumbent upon the Courts to look at the challengers posture in the industry and determine whether he is truly a potential entrant rather than a feigned entrant seeking to exact some collateral business advantage by virtue of the injunctive attack. *Cf. Schwimmer v. Sony Corp., supra.*

Plaintiffs seek to attack the syndicated news services of the network defendants. In their memorandum filed in opposition to defendants' motion, they argue that although presently not competitors with defendants in the daily syndicated news service market, "plaintiffs have the cameras; they have the staff; they have the capital to produce such [syndicated news services]." Plaintiffs' Memorandum at 87. They conclude that they must be viewed as potential entrants since they are financially and technologically able to enter the field of international news syndication.

Despite these conclusory arguments contained in plaintiffs' memorandum, the amended complaint belies any present intention or ability on the part of plaintiffs to enter the syndicated news service market. On the contrary, the essence of plaintiffs' complaint is the denial of access to the network defendants' own stations and affiliates in the presentation of their independently produced documentary and public affairs programs. Indeed, in reciting the productions of each of the plaintiffs, a task which plaintiffs have done in great detail, it is apparent that these productions are purely documentary in nature. None are the type of hard news or daily hard news gathering which comprise the syndicated news services under attack. In fact, the closest any of the plaintiffs' productions come to hard syndicated news is in the field of "social documentaries." This, however, is a far cry from the type of news syndication at issue. The fact that plaintiffs have the cameras, staff and capital does not form the basis for a claim that they are about to enter the field of producing musical reviews. The same logic applies with respect to the field of news syndication.

Moreover, nowhere does the amended complaint allege that the plaintiffs have a present intention to enter the news syndication market. Nor does the complaint allege that plaintiffs are financially or technologically able to do so. Indeed, the complaint indicates quite the contrary. The plaintiffs are a group of independent producers–directors. And, despite their fortuitous grouping for purposes of the instant lawsuit, there is no indication that they are ready to pool their resources, financial or technological, to set up the type of highly sophisticated international organization necessary to offer the daily syndicated news service in issue. However, it is evident that absent such a pooling, none of the individual plaintiffs possess the requisite resources to enter the news syndication field.

Finally, plaintiffs themselves admit that they have never produced or attempted to produce short video news segments which would comprise a syndicated news service. In addition, nowhere in an otherwise prolix complaint do plaintiffs contend that they ever offered such a service to the network defendants or their affiliates or took any affirmative preliminary steps to commence a syndicated news service.

In essence, plaintiffs argue that since they are generally in the industry, this is a sufficient basis upon which this court may conclude that plaintiffs are potential entrants in the news syndication market. However, in reality the only similarity between plaintiffs' documentaries and the production of daily syndicated news stories is that both are normally classified as being in the same general industry category for management, personnel and production purposes. This lone link, without more, falls well short of the type of reasonable entrepreneurial criteria necessary to establish plaintiffs as potential entrants into the market in issue.

Accordingly, plaintiffs' tying claims must be dismissed.[11]

■ I turn finally to plaintiffs § 1 claims. Section One of the Sherman Act prohibits contracts, combinations or conspiracies in restraint of trade. It does not, however, prohibit independent business decisions including a unilateral decision not to deal with another. *Modern Home Institute, Inc. v. Hartford Acc. & Ind. Co.*, 513 F.2d 102, 108–09 (2d Cir. 1975). *See also Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025 (2d Cir.), *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979). So long as the refusal to deal is the product of an independent determination, rather than an unlawful understanding, tacit or expressed, the decision does not run afoul of the antitrust laws.

Plaintiffs allege two separate conspiracies with respect to each of the network defendants—one intra–network, the other inter–network. The intra–network conspiracy charges that:

> For many years prior to the date hereof and continuing up to an including the date of filing of this complaint, defendant CBS has engaged in a combination with its owned and operated television stations (including defendant WCBS–TV), the CBS affiliates and others, and has entered into contracts, in unreasonable restraint of trade and commerce in television public affairs and news programs exhibited on the CBS Television Network, in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act.

The identical allegations were lodged against NBC and ABC.

■ The inter–network conspiracy charges that:

> For many years prior to the date hereof and continuing up to the date of filing of this complaint, defendants CBS, NBC and ABC, through a course of interdependent consciously parallel action, have engaged

11. Additionally, plaintiffs tying claim is fatally defective because it fails to allege two separate and distinct products—a tied and tying product. *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). Indeed, there is nothing to suggest that the affiliates view the news segments not used by the network defendants and those used by the network defendants as other than fungible news presentations fit for airing by the affiliate. *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). The mere fact that the network defendants have exercised their independent editorial discretion in determining which stories to air on their nightly news, does not alter the basic fact that the products are identical and the market for them the same. Nor is this an indication that those news reports not used by the networks were less desirable to the affiliates. To be sure, the value of a given news report to an individual affiliate is a function not of what the network defendants thought of it, but rather a function of the affiliates news needs on a given day as well as the relevance of a particular news story to the affiliates local broadcasting area.

In short, there is no allegation contained in the amended complaint which, even if true, establishes the news segments and the syndicated package of news segments as two distinct products. On the contrary, from all that is contained in the complaint, as well as in Plaintiffs' Memorandum, the indication is that these news items are mere components of defendants news productions.

in an agreement, combination and conspiracy in unreasonable restraint of the trade and commerce in television public affairs and news programs in the United States, in violation of section 1 of the Sherman Act and section 3 of the Clayton Act.

In turn initially to consider the intra–network conspiracies alleged by plaintiffs. As is obvious from what has previously been stated, there is nothing contained in any of the affiliation agreements, or any of the other contractual agreements executed by the network defendants and their affiliates, which precludes the affiliates from purchasing independently produced documentary or news programs. In fact, FCC regulations expressly prohibit such contractual arrangements. See 47 C.F.R. § 73.658(a), (d) & (e).

Nor is there any indication, either in the amended complaint or in plaintiffs' memorandum, to the effect that the network defendants attempted to coerce or otherwise exact the affiliates agreement to boycott the purchase of plaintiffs independently produced public affairs programs. And yet, plaintiffs insist that a series of conspiracies violative of § 1 of the Sherman Act and § 3 of the Clayton Act exist. In particular, plaintiffs charge, without benefit of elaboration, that each of the network defendants has conspired with its affiliates to boycott independently produced documentary programs. Plaintiffs' Memorandum at 36.

Plaintiffs' allegations, with respect to the intra–network conspiracies, amount to nothing more than a charge that since each of the network defendants has decided to produce their documentary programs in-house, the fact that it enters into affiliation agreements constitutes a conspiracy in restraint of trade. Thus, plaintiffs simply object to the fact that the network defendants have decided to produce their documentary programs in–house and offer these programs to their affiliates. And, when stripped of the bald charge of conspiracy, this charge amounts to nothing more than a reassertion of plaintiffs' monopolization claims. The plaintiffs have done nothing more than strategically insert the conclusory allegation of conspiracy in an effort to state a § 1 violation. In short, the allegations reveal only a unilateral decision on the part of the network defendants, vis–a–vis the affiliates, to produce their documentaries in–house.

There is no indication that any of the affiliate stations were privy to the network defendants' decisions with respect to the production of documentary programs. There certainly has been no suggestion that the affiliates had any input with respect to the decisions. In fact, there is absolutely nothing in the amended complaint to indicate that the documentary programing decisions of the network defendants was anything but a sound business decision reached quite independently from the affiliates. And, since the affiliates are free to accept or reject these in–house productions, there is not the slightest hint of coercion concerning the market for these productions.

Thus, insofar as plaintiffs amended complaint seeks to allege a conspiracy based upon the unilateral business decisions of each of the network defendants, the § 1 claims, with respect to the affiliate stations, are fatally defective. *Beech Cinema, Inc. v. Twentieth Century Fox Film Corp.*, 622 F.2d 1106 at 1107 (2d Cir. 1980); *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1030–31 (2d Cir.), *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979). Indeed, even if each of the network defendants had consulted with its affiliates concerning the production of documentary programs, a charge which is absent from the instant complaint, this, without more, would not establish a combination or agreement proscribed by the Sherman Act. *Borger v. Yamaha International Corp.*, 625 F.2d 390 at 394 (2d Cir. 1980).

Turning to the charge of an inter–network conspiracy, plaintiffs allege, again without further elaboration, that through a course of "interdependent consciously parallel action," the network defendants have conspired in restraint of trade.

■ There is no longer any doubt that the doctrine of "conscious parallelism" may constitute conspiratorial conduct within the ambit of the Sherman Act. *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954); *Modern Home Institute, Inc. v. Hartford Acc. & Ind. Co., supra.* However, it is equally clear that conscious parallelism, without more, will not state a claim under § 1. It must be demonstrated that the parallel decisions were interdependent in order to raise the inference of a tacit agreement. *Modern Home Institute, supra*, 513 F.2d at 110. *See also National Auto Brokers v. General Motors Corp.*, 572 F.2d 953, 959 (2d Cir. 1978), *cert. denied*, 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1979). To be sure, absent such an inference there is simply no basis upon which the finder of fact may conclude concerted action was afoot.

Plaintiffs urge that their allegation of conscious parallelism is sufficient, at least at this juncture, to withstand defendants' motions to dismiss and for summary judgment. The sum and substance of plaintiffs' argument is that they have inserted the word "interdependent" before the term "conscious parallelism." They conclude that the bald charge that the decisions of the network defendants were interdependent is, without more, sufficient to raise the inference of a conspiracy.

■ Defendants counter that the allegation of conscious parallelism plus the strategic insertion of the word interdependent is not sufficient to allege a claim under § 1. Rather, they urge that in addition to interdependent conscious parallelism, plaintiffs must allege certain "plus factors" which tend to indicate either a commitment to adhere to a uniform standard of behavior or that assurance is being given by the alleged co–conspirators as to what their conduct will be in the future. That is to say, the allegation of certain plus factors which indicate that the conduct was interdependent.

Although the doctrine of conscious parallelism has been judicially accepted, the dust has yet to settle with respect to those elements which must be alleged in order to state a valid claim under § 1 of the Sherman Act. *See e. g.*, Blechman, *Conscious Parallelism, Signalling and Facilitating Devices: The Problem of Tacit Collusion Under the Antitrust Laws*, 24 N.Y.L.S.L.Rev. 881 (1979). The vast majority of courts which have considered the question have concluded that in order to support a finding of conspiracy as a result of consciously parallel conduct, a plaintiff must present additional facts or circumstances tending to show that the actions of the alleged co–conspirators were interdependent or somehow concerted. *National Auto Brokers v. General Motors Corp., supra; Michelman v. Clark–Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1042–43 (2d Cir. 1976), *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976) ("at a minimum, [defendants'] actions, to support a finding of conspiracy, must suggest a commitment to a common end."); *Modern Home Institute, Inc., supra; Naumkeag Theatres Co. v. New England Theatres, Inc.*, 345 F.2d 910, 911–12 (1st Cir.), *cert. denied*, 382 U.S. 906, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965); *Consolidated Farmers Mutual Insurance v. Anchor Savings Association*, 480 F.Supp. 640, 649–50 (D.Kan.1979); *United States v. General Motors Corp.*, 1974–2 Trade Cas. ¶ 75,253 (E.D. Mich.1974). And, while there has been some disagreement with respect to what "plus factors" are sufficient to sustain a charge of interdependent conscious parallelism, *United States v. General Motors Corp.*, 1974–2 Trade Cas. ¶ 75,253 (E.D.Mich.1974), the requirement of these "plus factors" is firmly established. *Michelman v. Clark–Schwebel Fiber Glass Corp., supra*, 534 F.2d at 1042–43. In fact, only one court has found that the bald assertion of "interdependent consciously parallel actions" states a valid claim under § 1 of the Sherman Act. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446–47 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

In *Bogosian* the majority observed that there exists "a lively debate . . . concerning the relationship of interdependence to collusion," and if this debate is to be

resolved, it must be done on a fully developed factual record. 561 F.2d at 447. In sustaining the conclusory allegation of interdependent conscious parallelism, the majority concluded that a complaint was far too blunt an instrument with which to forge fundamental antitrust policies. *Id.* However, even the strength of this lone decision was undercut by a dissenting opinion attacking plaintiff's conclusory allegation of interdependent conscious parallelism. 561 F.2d 457 (Aldisert, J., dissenting). Indeed, Judge Aldisert observed that although "[t]he majority says that a 'complaint is much too blunt an instrument with which to forge fundamental policies' . . . if a complaint cannot even be depended on to state the essential theory of the litigation, I do not know how a court can correctly resolve the particular case, much less forge fundamental policies." 561 F.2d at 457.

The question before me, therefore, is whether the mere injection of the word "interdependent" to a charge of conscious parallelism is sufficient to withstand a motion to dismiss or one for summary judgment. On balance, I think that the liberal rules of pleading notwithstanding, the clear weight of legal precedent requires more than the bald assertion of interdependent consciously parallel conduct. This is especially true since the doctrine of conscious parallelism is itself a judicial gloss upon the otherwise clear requirement of concerted action. Indeed, while the doctrine has been accepted, it cannot be used to read the conspiratorial requirement out of § 1 of the Sherman Act.

■ There can be little doubt that in order to raise an inference of a tacit agreement to boycott, facts or circumstances are required to show that a series of apparently unilateral decisions were indeed interdependent. *Modern Home Institute, Inc., supra,* 513 F.2d at 110. It follows therefore, that in order to state a valid claim under § 1, a plaintiff must, at a minimum, allege how these decisions are interdependent by at least suggesting that there is some reason to believe that the defendants were committed to a common end. That is to say,

there is some reason to believe that these decisions were in the collective self interest of the conspirators rather than, or in addition to, their individual self interest. This does not impose an undue burden upon the plaintiff or require him to prove his claim in the complaint. Rather, it requires only that plaintiff fully set forth the legal theory upon which he hopes to recover, to fully apprise the defendant of the conduct which is alleged to be conspiratorial. This requirement is fully consistent with the liberal notice-pleading requirements in that it seeks only to notify the defendant of the legal theory upon which plaintiff intends to proceed.

Moreover, while there are numerous ways in which a series of apparently unilateral decisions may be proven to be interdependent, the legal theories behind such conduct are relatively few. For example, the classic situation is one in which the parallel decisions would be against the apparent individual self interest of the alleged conspirators. Such actions will benefit the individual conspirators only if the other conspirators adopt the identical course of conduct.

Thus, plaintiffs are not forced to fashion or recite esoteric legal theories in order to state a claim of conscious parallelism. Instead, they are required only to apprise the defendant of the economic basis upon which the charge of interdependence is grounded. This requires nothing more than an allegation of facts or circumstances which, if true, would raise the inference of a tacit agreement.

■ In sum, it is incumbent upon a plaintiff to allege, at a minimum, the legal and factual theory upon which his claim of interdependent conscious parallelism rests. Likewise, when the attack upon the claim is by way of a motion for summary judgment, the plaintiff must allege facts or circumstances to raise the inference of a tacit agreement to boycott. Absent such an inference there exists no question for the trier of fact to resolve. Only if the plaintiff offers such facts or circumstances will there exist a question of fact as to the interdependence of the consciously parallel conduct.

Turning to the case at bar, it is evident that plaintiffs' assertion of interdependent conduct fails to assert sufficient facts or circumstances to require the parties to proceed. However, the following elaboration of the alleged interdependent decisions is found in the plaintiffs' memorandum:

> In this case, plaintiffs will show *prima facie* interdependence. Plaintiffs will prove that independent documentary producers produce documentaries at less than one–half the cost which the defendants' own staff can produce them. These documentaries are of at least as high a quality as those produced by defendants and have won a significant number of awards. It would clearly be in the immediate interest of any one of the networks to buy such documentaries and can only be of benefit to any network to refuse to buy independent documentaries if all of them do so jointly.
>
> Moreover, plaintiffs believe that when advertising for documentaries is sold to national sponsors, the cost of production is included in the advertising price. If any one network bought documentaries from the independents, the advertising price to their sponsors would have to be significantly lower. The only way the present artificially high price structure of advertising time for documentaries can be maintained is if all of the networks follow the identical policies.

Plaintiffs' Memorandum at 82–83 (footnotes omitted).

These are the type of facts and circumstances that if contained in plaintiffs' amended complaint would, if only barely, state a valid claim. Thus, although the conspiracy as alleged is presently defective and must be dismissed, I will permit the plaintiffs to amend their complaint a second time to properly allege an inter–network conspiracy. Of course, after discovery has been concluded on this one claim, defendants may renew their motion for summary judgment.

Since plaintiffs have the opportunity to re–plead their § 1 claim, the question of defendants' request for a stay of the instant proceeding becomes relevant. As I noted at the outset of this opinion, defendants urged that should any claims survive the instant motions, the action should be stayed during the pendency of FCC proceedings which involve many of the policy questions presented herein. The defendants base their request for a stay on two grounds. First, they argue that "primary jurisdiction" to resolve the policy questions raised herein resides in the FCC. In addition, defendants argue that even if the doctrine of primary jurisdiction is technically inapplicable, given the nature of the charges lodged by plaintiffs, I should, as a matter of discretion, stay the instant proceeding pending FCC action.

I will not further burden this opinion with another recitation of plaintiffs' claims. Suffice it to say that plaintiffs attack the basic broadcasting practices of defendants in the area of news and documentary programs. Plaintiffs seek nothing short of a wholesale restructuring of the broadcasting industry. However, just as I doubt the sincerity of plaintiffs' First Amendment claims, I also question what is at the heart of plaintiffs' antitrust claims. From the voluminous papers which have been submitted in connection with the instant motion, it would appear that plaintiffs do not seek access to the airwaves, but rather seek to have defendants act as their selling agents in the marketing of their documentary productions. That is to say, rather than marketing their programs to the hundreds of licensed stations in the United States, plaintiffs desire that defendants perform this marketing task for them. Plaintiffs want to tap into three well established, albeit independent, distribution chains without incurring any of the expenses which attend the establishment and maintenance of such a nationwide distribution chain.[12]

---

12. In their memorandum, plaintiffs argue that they can establish that their production costs are ½ those of the network defendants. As-

suming the truth of this computation, the cost discrepancy may be explained in large part by reference to defendants intricate distribution

This conclusion is further supported by the fact that at best, plaintiffs can hope to compel defendants to consider and purchase some of their documentaries and thereafter offer these programs to their affiliates. However, the affiliates have the option, and not the obligation, to broadcast any programs offered to them by the network defendants. Indeed, under FCC regulations it is legally impossible for the defendants to in any way compel the affiliates to accept any of the proffered programs. See 47 C.F.R. § 73.658(a), (d) & (e). The affiliates still possess the editorial discretion to accept or reject any of the programs offered by the network defendants.

In any event, if, as plaintiffs urge, defendants are compelled to consider and purchase "some" of the plaintiffs' productions, by virtue of the economics of the situation as well as the affiliation agreements,[13] the network defendants would be obligated to offer these programs to their affiliates who, in turn, could accept or reject them.

In addition to access to defendants' distribution chains, plaintiffs also seek a risk free method of distributing their productions. As the industry presently operates, each of the network defendants produce their own documentary programs which are then offered to the affiliates. And, pursuant to FCC regulations, the affiliates are free to accept or reject the program. The network defendant, of course, bears the risk that its production will be unacceptable to its affiliates either because of its quality or its

subject matter. If, however, defendants were compelled to purchase some of plaintiffs productions, defendants would be forced to bear the risk of the marketability of plaintiffs' productions over which it has considerably less quality and certainly less subject matter control.

Consequently, if defendants are compelled to purchase plaintiffs' productions, plaintiffs would be at least partially assured of a market for their productions among the network defendants. However, given FCC regulations there is no guarantee that defendants would not be saddled with unmarketable productions. It is one thing for a company to bear the risk of the marketability of its own production, it is quite different to compel that company to bear the risk of the marketability of another's production. This is precisely what is at issue in the case at bar.[14]

■ The classic doctrine of primary jurisdiction provides that:

Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

chains. To be sure, part of defendants' production costs would naturally be attributable to the cost of distribution to its affiliates who may accept or reject a given production. Plaintiffs, however, are not contractually obligated to offer their productions to any licensed broadcasters and thus are not contractually bound to incur the distribution cost which naturally flow therefrom.

13. The affiliation agreements give the affiliates, in substance, the right of first refusal, as against any other television station located in the same community as the affiliate, of the network's programs. It does not, however, require the affiliates to accept any of these programs.

14. Of course, with respect to the 15 stations owned and operated by the network defendants

a more serious First Amendment problem arises. It is one thing to compel defendants to offer certain programs to their affiliates, it is quite another to compel defendants to air the plaintiffs' productions. Stated differently, it is quite a different situation when a group of individuals, here independent producers–directors, are granted access to present their own particular views on a given subject. See Columbia Broadcasting, supra, 412 U.S. at 112–13, 93 S.Ct. at 2091. The question then becomes whether the rights of these individuals will be permitted to override the obligation owed by the broadcaster to the public as a trustee. A question better left, at least initially, the FCC which is charged with broad regulatory duties in the broadcasting arena.

*Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). Thus, even though a claim is jurisdictionally cognizable in federal court where the court is required to resolve issues which are within the purview of a regulatory agency possessing expertise in the area, "the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States v. Western Pacific Railroad*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956).

Recently, the Ninth Circuit, in *Writers Guild of America West, Inc. v. American Broadcasting Co.*, 609 F.2d 355 (9th Cir. 1979), passed upon the doctrine of primary jurisdiction involving FCC regulation of broadcasters and the First Amendment. In *Writers Guild*, the FCC embarked upon a "jawboning" campaign to have the major networks adopt a system of self–regulation calculated to "reduce the amount of sex and violence in television programming without the need for any 'formal' Commission action." 609 F.2d at 359. In particular, the FCC was most concerned with minimizing the sexual and violent content of programs aired during the early evening hours. The result of the FCC's campaign was that the major networks adopted a "family viewing policy." This policy provided that during the early hours, only those programs appropriate for viewing by a general family audience would be aired.

The District Court found that the FCC's "jawboning" campaign constituted governmental action, despite the absence of formal FCC action, and as such constituted a *per se* violation of the First Amendment by exerting improper pressure on the networks. In short, the court found that the FCC's conduct had the effect of causing an unprecedented compromise in the independent judgments of the broadcast licensees.[15]

On appeal the Circuit reversed. The court, after a careful and well reasoned analysis of the doctrine of primary jurisdiction, concluded that jurisdiction in such a proceeding must, in the first instance, reside with the FCC. The court reasoned that despite the fact that the FCC's position on the issue of the "family viewing policy" was abundantly clear from the jawboning campaign it waged, "an explicit and well articulated determination [of the issues] by the FCC" would be of considerable assistance in the ultimate judicial determination of the issues. 609 F.2d at 363.

Plaintiffs' principal objection to the application of the doctrine is that the federal judiciary, and not the FCC, is charged with the obligation of ensuring a free competitive market. Plaintiffs' Memorandum at 153 n.60. They reason that although the FCC concededly possesses broad powers in the regulation of licensed broadcasters, it is not its function, nor within its expertise, to resolve alleged violations of the antitrust laws.

■ There can be no doubt that by commencing the instant suit the plaintiffs have launched a broadside attack upon the broadcast industry calculated to bring about a fundamental restructuring of the industry. And, despite plaintiffs' protestations to the contrary, the doctrine of primary jurisdiction is not to be summarily dismissed.

When stripped of the legal theories upon which plaintiffs proceed, the amended complaint attacks the in–house production policies of the network defendants. There is no question that the policy of each of the network defendants is identical in this regard. Nor is there any question that the FCC is presently conducting an investigation of these practices. *See* Appendix A of NBC and ABC's Joint Memorandum in Support

---

15. This is much the same type of compromise plaintiffs would have this court impose upon the network defendants. However, here, unlike in *Writers Guild*, the impetus for an industry wide change comes not from the FCC seeking to vindicate the interests of the general viewing public, but rather from private producers and directors who clearly have their individual economic self interests at heart.

of Their Motion To Dismiss.[16] And, although I doubt that these policies are the product of any concerted activity on the part of the network defendants, it is possible that the FCC, in its capacity as guardian of the public trust, could determine that the in–house production policies of the network defendants do not best serve the interests of the viewing public.

Further, by employing all the resources at its disposal, the Commission may be able to walk the tightrope between regulation and censorship and fashion a remedy granting plaintiffs, and other independents, an opportunity to produce documentaries for the network defendants while preserving the defendants' fundamental editorial prerogative. *See Columbia Broadcasting, supra*, 412 U.S. at 102–14, 93 S.Ct. at 2086–92. In any event, one thing is clear, the FCC must be afforded an opportunity to accomplish this concededly difficult task. *See FCC Regulation of Broadcast News, supra*, 48 Fordham L.Rev. 1226.

In accordance with the opinion above, plaintiffs' amended complaint is dismissed with leave to replead their § 1 claim within twenty (20) days insofar as that claim charges an inter–network conspiracy based upon interdependent conscious parallelism. Should the plaintiffs file a second amended complaint, the entire action will be stayed pending the outcome of parallel FCC proceedings.

SO ORDERED.

---

**16.** The appended FCC memorandum provides:

October 31, 1978
Mike Cummins
Meeting with Joel Levitch, Independent producer of news and public affairs documentaries.
Public File
Docket No. 21049

A meeting was held on October 30, 1978 and was attended by Tom Krattenmaker, Richard Metzger, Michael Couzens and Mike Cummins from the Network Inquiry Staff, and Joel Levitch, an independent producer of news and public affairs documentary programming. Mr. Levitch informed the staff that he was the lead plaintiff in an antitrust suit against the three television networks regarding their unwillingness to use independent producers to supply news and public affairs programming to be shown on the T.V. networks. Mr. Levitch also informed the staff that he would be writing a free–lance article for the Washington Post dealing with the Network Inquiry investigation.

The staff outlined its investigation into the television program supply industry indicating the issues that would be addressed. We explained that we would be investigating network practices with respect to procuring news and public affairs programming from independent producers. We also discussed possible causes for why the networks do most of their news and public affairs documentary programming in–house, as opposed to purchasing such programming from independent producers. The difficulty in discerning the number of potential suppliers of news and public affairs programming was indicated.

Finally, we indicated to Mr. Levitch that at some future period we would be in touch with him and other independent producers of news and public affairs programming in order to gather relevant data and to discuss in more detail current practices with respect to network procurement of this type of programming.